In the Matter of ROBERT EMERMAN, Respondent, v. JASON R. NATHAN, as Administrator of the Housing and Development Administration of the City of New York, Appellant.

First Department, June 9, 1970.

*Beverly Gross* of counsel (*Stanley Buchsbaum* with her on the brief; *J. Lee Rankin, Corporation Counsel,* attorney), for appellant.

*Jeremiah B. Bloom* of counsel (*Warren B. Pesetsky* with him on the brief; *Bloom & Crupe,* attorneys), for respondent.

NUÑEZ, J. The Administrator of the Housing and Development Administration of the City of New York appeals from a judgment entered at Special Term on June 6, 1969 annulling his dismissal of petitioner-respondent from his position as Supervising Steel Inspector in the Department of Buildings of the City of New York and directing his reinstatement. The respondent's order followed an administrative hearing. Initially, we wish to point out that Special Term's procedure was improper. The proceeding should have been transferred to this court for review of the Administrator's determination (CPLR 7804, subd. [g]). To avoid unnecessary duplication, we vacate the order entered at Special Term and consider the record as if the matter had reached this court in the prescribed manner. (See *Matter of D. H. K. Rest, Inc.* v. *New York State Liq. Auth.,* 31 A D 2d 525 and *Matter of Dan's Living Room* v. *State of New York Liq. Auth.,* 31 A D 2d 799.)

At the time of the occurrences herein, petitioner Robert Emerman, had been employed by the Department of Buildings of the City of New York for 21 years, the last 10 years in the capacity of Supervising Steel Inspector for the Borough of Manhattan. As such he was in charge of all loading tests, erection of all structural and reinforcing loads, structural steel and reinforcing rods that go into buildings and mechanical means of demolition, as well as the overseeing of steel inspectors in the borough.

Petitioner's difficulties arose in connection with the extensive renovation of a theatre at 81st Street and Broadway in Manhattan undertaken by Teletape Productions Co., its lessee. Petitioner was the Supervising Steel Inspector on this job.

Petitioner made inspections on August 14, October 4, and October 17, 1968. He advised the superintendent of construction that the steel was not being erected in conformity with approved plans and required the filing of amended plans. He insisted not only that amended plans be filed and approved, but that a professional engineer on the job would have to provide the necessary statements and affidavits stating that he witnessed the erection of the steel and that it was erected in accordance with approved filed plans. On October 31, 1968 petitioner called for

these statements and affidavits at the job site where he met Joseph Martin, superintendent or assistant superintendent of construction, who tendered to Emerman all necessary papers except the professional engineer's statement. Martin stated that the professional engineer's statement would be forthcoming the following day. Emerman returned on November 1, 1968 when all the necessary papers were delivered to him by Martin. Petitioner approved the steel work on the following working day. He then went on his vacation.

On November 14, 1968, the day petitioner returned, he was summoned to appear early in the morning at the Department of Investigations. Petitioner was there asked what Chief Inspector Clarke would charge for a public assembly permit; he replied that he knew nothing about public assembly permits and that he never had anything to do with such permits. He was told that they were not after him but that they wanted his co-operation. He was accused of wrongful conduct and threatened with loss of his job and prosecution unless petitioner co-operated with the Department of Investigations and named persons allegedly involved in bribery in connection with the theatre job.

On December 13, 1968 petitioner was notified that he was charged with misconduct consisting of the unlawful solicitation and acceptance of $500 from Joseph Martin on or about October 31 and November 1, 1968. A hearing on the charges was held before a duly designated hearing officer of the Housing and Development Administration on December 24, 1968 and January 6, 1969.

Martin testified that he saw Emerman from time to time on the job site; that he had had a conversation with petitioner sometime around noon on October 31, 1968 when petitioner asked him for $500 and that Martin said he would see what he could do. He passed the request on to his employers, a Mr. Raberg and Mr. Olsen who gave him five one-hundred dollar bills. He gave this $500, he testified, to petitioner sometime before noon on November 1, 1968. On cross-examination Martin stated that he had told the Department of Investigations that he had met Emerman before noon on October 31 and that it could have been as early as 11:00 o'clock on that morning. He further testified that his recollection was that he had told the Department of Investigations that he met Emerman a little after noon on November 1. He testified that he had practically nothing to do with the steel work; that there was nothing wrong with the steel work on the job; and that petitioner had objected to the work because "nobody seemed to know what was going on, and shop

drawings were lagging behind, and certain parts that had been changed during the course of construction were not filed with the Department of Buildings." He had never known Emerman before and had no social or other relationship with him except from seeing him on the job site. He testified that amended plans and specifications were filed at petitioner's request; that he had no idea why petitioner asked for $500; that all the steel work had been properly performed; and that the various professional engineering statements required by petitioner had been furnished. Martin told his employer: "He wants $500 for a P. A. That is the Public Assembly Permit." Likewise, before the Commissioner of Investigations Mr. Martin testified that he told Mr. Raberg, his employer, "he [Emerman] wants $500 for a P. A. That is the Public Assembly Permit." He testified that petitioner required everything that was necessary by way of proof of performance of proper steel erection and that the contractor was entitled to have the steel work marked off as being correctly installed.

Martin stated that no one heard petitioner request the $500 payment nor did anyone see him give the $500 to petitioner.

It was stipulated that if Martin's employer, Mr. Raberg, were called as a witness, he would have testified that sometime on October 31, 1968 he was advised by Martin that petitioner had requested a payment of $500 and that on November 1, 1968, Mr. Raberg gave Mr. Martin the sum of $500.

Emerman at all times denied any wrongdoing. He denied having solicited or having received any money from Martin. He called six character witnesses, described by the hearing officer as "absolutely unimpeachable and renowned people in the business community." All attested to petitioner's excellent reputation for honesty and integrity.

Petitioner introduced into evidence a time card for the month of October, 1968 which shows that he was clocked in at the Department of Buildings on October 31, 1968 at 8:27 A.M. and did not leave until 11:23 A.M. This time card is stamped by a time clock kept in the Department of Buildings and not in any wise in petitioner's control. He also introduced in evidence a route card for October 31, 1968 showing that he did not arrive at the job site in question until 3:50 in the afternoon of that day. This route card is attacked as a self-serving record, but the fact is that it was in the exclusive possession of the Department of Buildings from November 1, 1968. Another time card established the fact that he arrived at his office on November 1, 1968 at 7:56 A.M. and left at 12:21 P.M. A route card for the

same day shows that he arrived at the job site at 2:20 in the afternoon. The hearing was then closed and reopened on January 6, 1969 for further cross-examination of petitioner.

In his decision, the hearing officer stated "Had the hearing been concluded on December 24, 1968, the testimony of Martin alone in view of the foregoing would not have been sufficient to sustain the charges, since a plausible alternative to the testimony of Martin would have been that Martin kept the $500 himself".

At the January 6, 1969 hearing Emerman testified that on December 24, 1968 he went to his desk at the Buildings Department at his counsel's suggestion and assorted the journal sheets he thought were required for the adjourned hearing and left. He estimated the time spent in doing this about five minutes; that while there he met Chief Inspector Clarke and told him that he had gone there at the suggestion of his counsel for the sole purpose of placing certain papers where they could be found. Mr. Clarke testified at the same hearing that his best estimate of the time spent by the petitioner at the office was about a half an hour.

The hearing officer held that Emerman's visit to his desk and subsequent events tarnished petitioner's credibility and held that petitioner, while under suspension, took it upon himself to invade his desk in such a flagrant and unwarranted manner that it made his testimony suspect and he found the department's charges sustained. He recommended that petitioner be suspended without pay for a period of 60 days. The Administrator dismissed petitioner.

In our opinion, if, on the whole record, the charges had been sustained, dismissal was the proper punishment and not suspension for any period of time.

While it is true that at the time petitioner visited his office he was under suspension, there is nothing in the record to show that he was forbidden access to his desk. He acted under advice of counsel. His act in following his lawyer's suggestion should not be permitted to supplant the missing evidence to sustain the charges against him. The case against Emerman still depended solely upon Martin's testimony. The hearing officer stated that this would not have been sufficient to sustain the charges. But there is no other evidence.

The record establishes numerous contradictions in Martin's testimony. He changed the time of the demand and the delivery of the money several times in answer to leading questions to conform to records such as time cards. Concededly, Emerman

had nothing to do with the P. A. system, yet Martin told his employer and the Department of Investigations that the bribe had been demanded for the P. A. system. Martin was unable to provide any motive to justify payment of the bribe. All the work had been properly performed.

The scope of judicial review of quasi-judicial determinations of administrative tribunals is governed by the " substantial evidence " rule i.e., whether on the whole record there was substantial evidence to support the administrative determination. (*Matter of Stork Rest. v. Boland,* 282 N. Y. 256; *Matter of Lynch's Bldrs. Rest. v. O'Connell,* 303 N. Y. 408; *Matter of Humphrey v. State Ins. Fund,* 298 N. Y. 327; *Matter of Miller v. Kling,* 291 N. Y. 65; *Matter of Reynolds v. Triborough Bridge & Tunnel Auth.,* 276 App. Div. 388; *Matter of Phinn v. Kross,* 8 A D 2d 132.)

But the meaning of " substantial evidence ", in applying the test to particular cases, has not received — and cannot because of the broad generality of the term — any exact definition.

A review of the substantiality of the evidence is not a mere perfunctory, passive function (*Matter of Reynolds v. Triborough Bridge & Tunnel Auth., supra,* p. 393). In *Matter of Di Nardo v. Monaghan* (282 App. Div. 5, 7) where this court annulled the determination of the Police Commissioner in dismissing a police sergeant, we said: "In the last analysis, we think substantial evidence means evidence which is entitled to carry conviction." (For further discussion of the substantial evidence rule see: Jaffe, Judicial Review: Question of Fact, 69 Harv. L. Rev. 1020; Jaffe, Judicial Review: Substantial Evidence on the Whole Record, 64 Harv. L. Rev. 1233; Schwartz, Gray v. Powell and the Scope of Review, 54 Mich. L. Rev. 1.)

We recognize that where there is " substantial evidence " the administrative agency, not the court, is the final arbiter of any fact issues. In cases involving disciplinary action against an employee of a governmental department, it is necessary to strike a balance between the obligation of an administrative official to perform the public duty vested in him and the individual employee's right to be dealt with fairly and justly. In the last analysis, the head of a government department is charged with the responsibility of its efficient and honest operation. It is not for the courts to perform, nor will the courts share in or receive the brunt of any public criticism arising from an administrator's failure to clean his house.

In *Matter of La Forge v. Kennedy* (8 A D 2d 143) this court confirmed the determinations of the Police Commissioner dis-

missing two police officers on the testimony of two civilians. The charges were that the two officers arrested the two civilians, wrongfully accused them of possession of contraband narcotics and then proceeded to exact from them some $25 and a watch to secure their release. Each of the two civilians substantially corroborated the testimony of the other. Prompt complaint had been made the very next morning to the office of the First Deputy Police Commissioner. The complaints were promptly recorded as was the reporting of the shield number of one of the patrolman and the prompt identification of the two police officers involved. One of the complainants had been convicted of a crime and the other had been arrested but not convicted.

This court ruled that the test is not what the court believes, or what it thinks it would believe if it had seen and heard the witnesses, but whether the Police Commissioner or his Trial Commissioner could have reasonably believed the evidence supplied and confirmed the determination of the Police Commissioner dismissing the two police officers. The Court of Appeals unanimously reversed this court and annulled the Police Commissioner's determinations "upon the ground that this record lacks substantial evidence to support them." (*Matter of La Forge* v. *Kennedy,* 7 N Y 2d 973, 974.)

Under all of the circumstances disclosed, and after a careful examination of the record, we are unanimous in our conclusion that there was no substantial evidence on the whole record to establish the charges against Emerman. The order of Special Term should be vacated and the matter be determined by this court as though the proceeding had been transferred to this court for review of the Administrator's determination. The determination of the Administrator dismissing petitioner should, therefore, be annulled, on the law, without costs and without disbursements, and petitioner reinstated.

CAPOZZOLI, J. P., McGIVERN, MARKEWICH and TILZER, JJ., concur.

Judgment entered on June 6, 1969 be and the same hereby is vacated and the matter determined as though the proceeding had been transferred to this court for review of the Administrator's determination. Accordingly, it is unanimously ordered that the determination of the Administrator, dated January 30, 1969 and redated February 5, 1969, be and the same hereby is annulled, on the law, without costs and without disbursements and petitioner reinstated.