George Beisheim, Jr., J.
This is an article 78 proceeding brought by the petitioner consisting of two unincorporated associations of homeowners as well as four individual homeowners *867 residing on the shores or in the vicinity of Lake Mohegan in the Town of Yorktown to set aside and vacate the determination of the Town Board of the Town of Yorktown (Resolution No, 203) dated May 2, 1972, approving the site plan submitted by the intervenor, Chalet Homes, for the construction of 168 apartment units on Lake Mohegan. The aforesaid resolution was adopted by the Town Board after a public hearing held on April 18,1972.
The matter came before the court at Special Term, Part I, and was originally referred by Mr. Justice Grady, who was presiding at said part, to Special Term, Part III-A, and by amended order to Special Term, Part III, to hear and determine all triable issues of fact raised in this proceeding.
This court, after reading Mr. Justice Grady’s decision dated September 5, 1972, and reviewing the papers submitted by all parties in connection with the article 78 proceeding finds the triable issues of fact to be as follows:
1. Whether the Town Board in rendering its decision on May 2, 1972, approving the site plan acted in an arbitrary and capricious manner without giving independent and meaningful consideration to the requirements of the Zoning Ordinance of the Town of Yorktown and the requirements of the town development plan.
2. Whether the Town Board acted in an arbitrary and capricious manner in approving the site plan without giving independent and meaningful consideration to the effect of the apartments on the pollution of Lake Mohegan.
3. Whether the Town Board acted in an arbitrary and capricious manner in approving the site plan without giving independent and meaningful consideration of the impact on traffic congestion in the Lake Mohegan area.
4. Whether the Town Board acted in an arbitrary and capricious manner in approving the site plan without giving independent and meaningful consideration of the burdens that would be imposed on local schools. -
On February 20, 1967, 60 acres of property in the Town of Yorktown, including the property of Chalet Homes, was reclassified from a single-family residential zone into an R-3 district suitable for medium to high density, multi-family apartments. The zoning ordinance provides:‘ ‘ Section 423 Schedule of Regulations * * * All multi-family or apartment development shall be as specified on a site plan approved in accordance with the provisions of Sections 442.1-442.4.” Section 442.1, pertaining to “ Individual Standards for Each Special IJse ” reads *868 as follows: ‘ ‘ 442.1 General Requirements: The following regulations supplement the Schedule of Regulations as specifically indicated in the Schedule. Where the Town Board or Planning Board are required to act upon a plan of development, no permit shall be issued except for building in conformity with such approved plan, and no certificates of occupancy shall be issued until all of1 the requirements of this Section, including those required by the Town Board and Planning Board under the provisions of this Section, have been met.” Section 442.2 pro-, vides that all applications for plan or development approval shall be made to the Town Board, which may authorize the Planning Board to review, approve or disapprove such plan pursuant to and in accordance with requirements of the Town Law (Town Law, §§• 274, 275, 276, 277). Section 442.3 states the standards for the plan of development approval and reads, in part, as follows: “ 442.3 Standards for the Plan of Development Approval: In acting on any proposed plan of development, the Town Board and Planning Board shall take into consideration the requirements of the Town Development Plan and Official Map.”
Mr. Justice Grady in his decision stated: 1 ‘ the Town Board was required by § 442 of the Yorktown Zoning Ordinance to ‘ take all of the requirements of the Town Development Plan into consideration in connection with the approval of the site plan of the subject property. ’ ” This directive of Mr. Justice Grady would seem to be the law of the case, but this court independently similarly so holds, and would have so held had Mr. Justice Grady’s decision not have been rendered. The pertinent provision of the town development plan provides as follows: “ Apartments-Medium High Density * * * In developing the Town Plan, the need is recognized for achieving a community that has a variety of residential building types including apartments. The areas that are set aside for apartment development are in the hamlet areas of Lake Mohegan, Shrub Oak, Jefferson Valley, Crompond and Yorktown Heights.. Such location should tend to strengthen the retail and service cores of these hamlet areas and, in addition, the retail cores are then in a position to supply the retail and service needs of the apartment development. In addition, such apartment developments should be serviced by public water and by public sewers and should be adequately related to traffic circulation facilities, both within the site and within the area of development.” (Emphasis added).
*869 The earlier 1955 town development plan contained a somewhat similar provision: 11 The highest density of residential development would be in the already developed areas of Yorktown Heights, Lake Mohegan, and Shrub Oak, where a standard of no more than one house per 10,000 square foot lot would be recommended, except in a few places where two families per 10,000 square foot lot would be appropriate. No development of a higher density should be permitted in these areas unless public sewer systems and disposal plant facilities become available.”
Supportive of the town development plan is the housing study prepared by the Town of Yorktown’s Department of Planning in March, 1971. In chapter IV under the subdivision ‘ ‘ General Comments ” it is stated: “ A primary objective of Yorktown’s housing policy is the expansion and diversification of housing opportunities within the Town, in accordance with the policies outlined in the Town Development Plan as stated above.”
The court believes that the neighborhood analysis prepared by the Town of Yorktown’s Department of Planning in August, 1967, also is worthy of consideration in resolving the issues in the proceeding now before the court. Under the subtitle “ Community Facilities ”, it is stated:
“ Recreation — Lake Mohegan covering 105 acres is a lake around which summer colony cottages have been built. It is a natural recreation area at this particular time and it serves as a focus for the Lake Mohegan Beach District — one of the special districts in the Town. It is privately owned and privately run. Other recreation lands in this area include the George Washington School site which can be utilized for recreation. A very small part of the Ladycliff Academy is devoted to recreation. There are a few parcels around Lake Mohegan which are Town owned and are not developed for recreation. : * * *
“ Utilities — There are no public or private sewers in this area at the present time. The 60 acres which have been resoned for apartments will have to be provided with adequate sewers prior to being built. The Town currently has a feasibility study underway of sewers in the Shrub Oak Brook Drainage Shed— á portion of which would be located in this area.” (Emphasis added).
The site plan incorporated a proposal to build 208 luxury garden apartments, 168 for the initial stage with a projected population of 376 persons. The apartments were to be serviced by two separate systems as the sole means of waste disposal, *870 each consisting of a 9,000 gallon septic tank, a dosing chamber and associated tile drainage fields. The septic tanks and dosing chambers were to be placed 580 and 680 feet respectively from Lake Mohegan on relatively level ground 16 to 18 feet above the lake level. The tile drainage fields were to extend 120 feet towards the lake, dropping down to an elevation only 10 feet above the lake.
The minutes of the meeting of the Town Board held on April 18,1972, in connection with the public hearing held on that date for consideration of the application for approval of the aforesaid site plan read, in part, as follows: “ Kenneth Saum arrived after the hearing on Chalet Homes Site Plan was declared closed, however, Supervisor Spadaccia extended him the courtesy to be heard. He objected to any further development in the area on the grounds that the matter of sewage disposal would be an additional threat to the pollution of Lake Mohegan. Supervisor Spadaccia informed him that it is mandated that the developer connect to the sewer system to be installed in the area.” (Emphasis added).
The Planning Board on April 18,1972, recommended approval of the site plan, and the Town Board approved said site plan on May 2,1972 .subject to compliance with the recommendations of the Department of Planning and of the Town Engineer’s report. Of possible significance, but unexplained at trial, is item 17 in the Town Engineer’s report: “ 17. On General Notes on Profile For Sanitary Sewers. Note #2 to read 1 Town of Yorktown Road Specifications ’ instead of Sewer Specifications, dated March 21, 1967.”
The court believes that the same rules are applicable to the instant proceeding as are in effect in a judicial hearing reviewing a determination of a zoning board of appeals. Additional proof may be taken by the court, but the issue to be decided is whether the action of the board was arbitrary or capricious (Thayer v. Baybutt, 29 A D 2d 486, affd. 24 N Y 2d 1018; Matter of Davison v. Segur, 24 A D 2d 797; Matter of Joynt v. King, 6 A D 2d 234).
Dante Spadaccia, the Supervisor of the Town of Yorktown, testified at the trial that in voting on the resolution passed by the Town Board on May 2, 1972 that he relied upon the recommendation of the Planning Board adopted at its meeting of September 8, 1966 and the approval of the Westchester County Health Commissioner. The Planning Board resolution of September 8, 1966, reads as follows:
*871 “ FRIEDA 8P0LL
“ (Bequest for change of zone)
“ Judge Jerome Hersh appeared to represent the applicant. The Planning Consultant, Kylar, had submitted a report at the last meeting, which report indicated that the request for change of zone from B 1-10 to B 3 is appropriate because the area is designated for medium high density on the Master Plan. However, the Consultant states, the change would only be accept-, able where provision for sanitary sewers were satisfactory to the Town.
“ The Chairman explained to Judge Hersh that he must have all of the proper Health Departments sewer approvals and the Judge stated that the applicant was aware of that fact.
‘ ‘ Mr. Mountan stated that he was against recommending approval of so many apartments at this time, and that it seemed to him that the intention of the Master Plan was that the building of apartments should be spread over a ten year spam

“ The Board’s majority opinion was that if the requirements for sewer facilities could be met to the satisfaction of the Town and the County, then the change was proper in accordance with the Master Plan.

“ The request for change of zone from B 1-10 to B 3 was approved.” (Emphasis added).
The Supervisor admitted that the Town Board had not made any studies of Lake Mohegan to ascertain the chemical content thereof, and had no documents or reports pertaining to the condition of the lake when the resolution of May 2, 1972, was adopted. He also stated that he personally did not inspect the site of the proposed Chalet Apartments before voting on the resolution of May 2, 1972.
Town Councilman John Hand also testified and his testimony neither added to nor subtracted from the testimony of the Supervisor in respect to any knowledge or inquiry concerning the condition of the lake. Mr. Hand also made no personal inspection of the proposed Chalet Apartment site. The parties stipulated that if Councilmen Murphy and Owens should testify, that their testimony would be substantially the same as the testimony of Councilman Hand.
The respondents called as a witness Calvin Weber, the Assistant Commissioner of Health for Environmental Services of Westchester County, whose duties and responsibilities included the planning for sewerage disposal and water control in the county. Mr. Weber stated that he issued two permits to Chalet Homes on June 7, 1972, each permit being for a septic tank *872 system on the property of Chalet Homes where the 168 apartments were to be erected. Mr. Weber stated that neither he nor anyone from the County Health Department, to his knowledge, inspected the Chalet Homes site before the permits for the septic tanks were issued, and that said permits were issued solely in reliance upon the proposed .site plans and reports of Chalet Homes and its engineer. Mr. Weber stated that these plans met the New York State and Westchester County requirements. Specifically, the permits were issued on the application, the engineer’s report, soil percolation data report, the test pit information furnished by the applicant’s engineer, and the plans for the septic .systems. Mr. Weber did not recall if he gave consideration to the nature of the slope at the Chalet Homes site and stated that he had no report that this slope extended into a muck area at the edge of the lake. He said that under county regulations septic fields would have to be 50 feet away from a marsh or swamp. Mr. Weber stated that the pits for the soil tests should have been dug at the lower end of the .slope rather than at the higher part of the slope, but admitted that he did not know where the applicant’s engineer had dug the pits. He admitted that he relied upon soil tests made by the applicant’s engineer over five years earlier.
Mr. Weber gave no indication in his testimony that he was aware of the requirement of the town master plan for the Town of Yorktown that apartment houses should be serviced by public sewers. He admitted on cross-examination that at least in one spot the muck or marsh adjoining Lake Mohegan was only 20 feet rather than 50 feet from the septic field as required by county regulations.
It seems quite clear that the requirement for apartment houses for disposal of sewerage by public sewers as set forth in the town development plan of the Town of Yorktown was a stricter requirement than the regulations of the State of New York (Town Law, § 269; Public Health Law, § 1230, .subd. 5; Public Health Law, § 1260), and County of Westchester. Even if the septic system for the proposed Chalet Home Apartments should be deemed to have met county and State requirements, this would not abrogate the need for compliance with the more stringent town requirements (Matter of Parmadale Development v. Planning Bd. of Town of Parma, 35 A D 2d 904; Clark v. Fogelsonger, 284 App. Div. 832).
Moreover, the certificates or permits of the County Health Department, as admitted by Mr. Weber, were issued in violation, at least in one instance, of the Westchester County require *873 ments, to wit, the septic field was within 20 feet of the lake marsh.
It is obvious that the Town Board of Yorktown relied completely upon the County Health Department insofar as the requirements for the disposal of sewerage were concerned. Having done so, when the County Health Department disregarded the Town of Yorktown requirements, in effect, this meant that the Yorktown Town Board also violated its own town requirements. The board obviously was misled by the County Health Department, but this did not relieve it of its responsibility of insisting that the sité plan should comply with the town zoning ordinance and the town master plan.
The court, accordingly, in respect to issue of Fact No. 1 aforesaid finds that the decision of the Town Board was arbitrary and capricious in that the board did not give independent and meaningful consideration to the requirements of the town zoning ordinance and its own town development plan which provided that apartment developments should be serviced by public sewers before a site plan could be approved.
In respect to issue of Fact No. 2 aforesaid, the court also finds that the Town Board acted in an arbitrary and capricious manner in approving the site plan without giving independent and meaningful consideration to the effect of the apartments on the pollution of Lake Mohegan.
In considering this question, the court agrees with the comment of Mr. Justice Hawkins in Matter of Nattin Realty v. Ludewig (67 Misc 2d 828, 831): “ Respecting ecology as a new factor, it appears that the time has come — if, indeed, it has not already irretrievably passed — for the courts, as it were, to take 1 ecological notice ’ in zoning matters.”
Hnder article I — “ purposes “ Section 100 — Purposes and Enactment ”, subsection 109 of the town zoning ordinance reads as follows: “ To protect the pollution of streams and ponds ”.
The testimony of the Supervisor and three Town Councilmen and the minutes of all pertinent proceedings before the Town Board and the Planning Board reveal that the question of the pollution of Lake Mohegan in the event that a large apartment house was erected on its shores with sewerage therefrom to be taken care of by two large septic tanks, was not independently considered, if considered at all, by either the Town Board or the Planning Board. The Town Board relied solely on the County Health Department. The County Health Department made no inspection of the site, nor did it take any tests concerning the quality of the water of Lake Mohegan. Apparently, *874 the possibility of a pollution hazard was completely ignored by all persons having any involvement in making recommendations, or in rendering a decision pertaining to the Chalet Apartments site plan.
Testifying at trial for petitioners were Dr. Raul R. Cardenas, Professor of Civil Engineering at New York University, Dr. Erick Gidlund, Assistant Professor of Civil Engineering at New York University, and Dr. Guenther Stotzky, Professor of Biology, all of whom the court finds to have been pre-eminently qualified as experts in the fields of ecology, biology, sewerage disposal and water pollution.
Dr. Cardenas, assisted by Mr. Richard Knabel, science teacher at Yorktown High School, and a number of Mr. Knabel’s students as well as some of Dr. Cardenas ’ students, conducted many diverse tests over a period of many months pertaining to the condition of the water in Lake Mohegan. These tests and Dr. Cardenas ’ conclusions are incorporated in Dr. Cardenas ’ report. It was Dr. Cardenas’ opinion that Lake Mohegan is a eutrophic lake under serious environmental stress with 1 algae growth already evident due to the high levels of nutrients in the water, particularly phosphorous and nitrates. It was Dr. Cardenas’ opinion, and also the opinion of Drs. Gidlund and Stotzky, that septic tanks as the sole means of waste treatment for the Chalet Apartments will not be adequate to remove nutrients and other organisms from the sewage effluent. It was the opinion of these experts that the imposition on Lake Mohegan of the .septic effluent from Chalet Apartments will result in an accelerated deterioration of water quality, reducing recreational uses, resulting in scums, odors and other potential health hazards, and seriously compromising the essential environment of Lake Mohegan.
The respondents produced one expert, Dr. Hugo Freudenthal, an aquatic and marine biologist and professor of marine science at Long Island University, who expressed a contrary opinion to the views of petitioners’ experts, and which is set forth in his report. The court concludes that the tests made by Dr. Freudenthal were superficial, and the court was not impressed with his testimony, particularly on cross-examination.
Accordingly, the court finds that should the Chalet Apartments be built and occupied, that the waste products from said apartments would not be adequately j treated and disposed of by septic tanks, but, on the contrary, would find their way into the waters of Lake Mohegan with the probability of great damage to this already eutrophic lake.
*875 In reference to issues of Fact Nos. 3 and 4, the court finds that the Town Board did not act in an arbitrary and capricious manner in approving the site plan, and did give independent and meaningful consideration of the impact on traffic congestion in the Lake Mohegan area and to the burdens that would be imposed on local schools. The court believes that the Town Board gave serious, conscientious and meaningful consideration as to these two possible problems and that the record well supports the judgments implicit to the board’s decision in these two regards.
It was unfortunate' that the experts upon whom the board relied for answers to the questions (1) whether septic tanks described in the Chalet Apartments site plan complied with the requirements of the Yorktown Zoning Ordinance and town development plan, and (2) whether there was a pollution hazard to Lake Mohegan, did not meet their responsibilities. The experts advising the board apparently did not even consider these problems.
Wherefore, the court grants judgment in favor of the petitioners annulling the determination of the respondents approving the site plan, and adjudicates and declares the purported approval heretofore made by said Town Board to be illegal and without foundation in fact or law.
Submit judgment on notice.