John F. Scileppi, J.
This is a complex and multifaceted litigation involving, essentially, an interpretation of the term "tidal wetlands” as it is used in the new Tidal Wetlands Act (ECL art 25), which accounts for this rather lengthy decision.
The background of this litigation is as follows. Barnes Building Co., Inc., one of the parties, plans to erect a housing development on land adjoining Hook Pond in the Village of East Hampton. The Group for America’s South Fork, Inc., a conservation group, objects to the proposed construction on the ground that Hook Pond and the surrounding land are tidal wetlands. The Tidal Wetlands Act which became effective September 1, 1973, places a moratorium on the development of tidal wetlands. It provides that a builder must first apply for a hardship permit from the New York State Department of Environmental Conservation, which administers the act. That department would then weigh the degree of hardship presented by the builder with the adverse impact on the ecology that the proposed construction might have. Accordingly, the Planning Board of the Village of East Hampton sought an opinion from the Department of Environmental Conservation before issuing any building permits to Barnes Building Co. The department said that Hook Pond and the adjoining land are not tidal wetlands and thus it did not have *427 any jurisdiction over the area. Consequently, the planning board gave final approval to Barnes’ plans in January, 1974 and accepted and filed a map of the development to be known as Pondview. However, the group requested the Department of Environmental Conservation to hold an evidentiary hearing on the matter, which was conducted in February, 1974. All parties had the opportunity to produce witnesses and to cross-examine their opponents’ witnesses, and to submit documentary evidence. The hearing officer presented his findings of fact to the Commissioners of the Department, and, on June 14, 1974, Commissioner Biggane issued his determination that Hook Pond and the surrounding area are not tidal wetlands within the meaning of the statute.
The group and two individuals, Dorothy Case O’Brien and llene O. Wolff, have brought an article 78 proceeding to annul the commissioner’s determination, against J. L. Biggane as Commissioner, the New York State Department of Environmental Conservation, the Planning Board of the Village of East Hampton and Barnes Building Co. In addition, the same three parties have brought an action for a permanent injunction against Barnes Building Co. and Vincent Amann, the Building Inspector of the Village of East Hampton. These two pending matters have not been formally consolidated. However, since the substantive issues involved are similar and both matters were brought before me at the same time, I will deal with them both in this one decision. For the sake of simplifying the nomenclature, although the parties are known as plaintiffs and defendants in the action, and as petitioners and respondents in the special proceeding, I will refer to them throughout as plaintiffs and defendants.
There is also a motion pending by the plaintiffs for a preliminary injunction, and four motions by the various defendants to dismiss both the proceeding and the action. I will also dispose of these motions in this decision.
There are a number of thorny procedural questions that must be resolved before the substantive issues are reached, and I will deal with them first.
The defendant Barnes challenges the article 78 proceeding on the grounds that neither the corporate plaintiff nor the individual plaintiffs have any standing to sue; that there is another action pending; and that no order was ever filed pursuant to the determination of the Department of Environmental Conservation to which a proceeding to review can *428 refer. With respect to the action for injunctive relief, the defendant Barnes argues that it, too, should be dismissed because there is another matter pending. Finally, the defendant Barnes attacks the right of the plaintiffs to introduce new evidence in the article 78 proceeding that was not adduced at the hearing below. The defendant planning board seeks to dismiss the article 78 proceeding on the grounds that it is barred by the Statute of Limitations, and the defendant Amann seeks to dismiss the action for injunctive relief on the same ground. Finally, there is a complicated procedural question which the court is raising sua sponte, as to whether Special Term of the Supreme Court has jurisdiction to entertain the article 78 proceeding. All these questions except the latter one have been raised by motions to dismiss by the defendants Barnes, planning board and Amann. I will repeat that the defendants also assert arguments on the substantive merits in their motions and in their answers to the complaint and the petition, and I will discuss all of them in detail later herein. For the moment, I shall deal only with the procedural questions.
I will first consider whether this court has jurisdiction over the article 78 proceeding since, if it does not, any other considerations would be futile. In this regard, CPLR 7804 (subd [g]) states: "Where an issue specified in question four of section 7803 is not raised, the court in which the proceeding is commenced shall itself dispose of the issues in the proceeding. Where such an issue is raised, the court shall make an order directing that the proceeding be transferred for disposition to a term of the appellate division held within the judicial department embracing the county in which the proceeding was commenced; the court may, however, itself pass on objections in point of law. When the proceeding comes before it, whether by appeal or transfer, the appellate division shall dispose of all issues in the proceeding, or, if the papers are insufficient, it may remit the proceeding.”
CPLR 7803 (subd 4) is this: "whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence.” In the proceeding before me, the petitioners allege that the determination of the Department of Environmental Conservation was erroneous because, among other things, the hearing officer failed "to take cognizance of substantial evidence showing that the area in *429 question was in fact connected to tidal wetlands.” If a case qualifies for transfer to the Appellate Division because of a question of substantial evidence, then such a transfer is mandatory, and it is not up to the discretion of Special Term. (See 24 Carmody-Wait 2d, NY Practice, § 145:349.) Which cases require transfer and which do not, and whether the entire proceeding must be transferred, are questions that have been the subject of much litigation over the past few years, with no clear consensus having evolved. In fact, there are different viewpoints among the four judicial departments.
The First Department interprets this statute most strictly with respect to requiring a case to be transferred to the Appellate Division in the first instance. The opinions of that department have not explained the reasoning of the court in much detail, but have stated simply that the proceeding should have been transferred because it followed an administrative hearing and sought to review the determination at that hearing. (See, e.g., Matter of D.H.K. Rest. v New York State Liq. Auth., 31 AD2d 525, affd without opn 28 NY2d 836; Matter of Emerman v Nathan, 34 AD2d 282.) Similarly, the First Department wrote in Matter of Dan’s Living Room v New York State Liq. Auth. (31 AD2d 799, affd without opn 25 NY2d 759): "The fact that a hearing was held made it mandatory that there be appellate review as to the question of substantiality of evidence based on the entire record. Thus, the entire proceeding to review should have been transferred to the Appellate Division”. Most recently, the First Department reiterated its position on CPLR 7804 (subd [g]) in Matter of Hammerl v Mavis (41 AD2d 724, affd without opn 34 NY2d 579): "As the proceeding was based on an administrative hearing and questioned the interpretation of evidence, the matter should have been transferred to this court.” Not only does the First Department feel that such a proceeding must be transferred whenever there has been an evidentiary hearing, it also seems to take the position that the entire proceeding should be transferred ab initio even though there are also questions of law involved. CPLR 7804 (subd [g]) seems to indicate, in the second sentence thereof, that even when an order of transfer is necessary, the Supreme Court may itself pass on objections in point of law, and then effect the transfer. The next sentence of the statute then states that the Appellate Division, after the transfer, shall dispose of all issues in the proceeding. In other words, the Supreme Court has the *430 option either to transfer the entire matter to the Appellate Division at the outset, or to decide the questions of law and then transfer only the question of substantial evidence. This was the interpretation adopted, I think, correctly, by the Supreme Court of New York County in Matter of Leopold v Tofany (68 Misc 2d 3). The lower court in that case acknowledged that the question of substantial evidence had been raised, but it concluded that it did not have to reach that question, because it ruled in favor of the petitioner on the question raised in CPLR 7803 (subd 3): whether the determination was arbitrary and capricious. The First Department affirmed the Supreme Court’s conclusion (38 AD2d 550) but it disapproved of the lower court’s decision not to transfer the proceeding at the outset: "We treat the proceeding as if it had been transferred in the first instance (CPLR 7804, subd. [g]). Upon this record we find the determination of the Commissioner was not supported by substantial evidence.” Also, in Matter of Dan’s Living Room, Ltd. v New York State Liq. Auth. (31 AD2d 799, supra), the court clearly stated that the entire proceeding to review should have been transferred to the Appellate Division. I should point out that in those First Department cases that were affirmed by the Court of Appeals, there was no opinion in the higher court and these questions about CPLR 7804 (subd [g]) did not appear to have been raised.
In the Second Department, also, there has not been any full discussion of these questions of transferability. In Matter of Mistler v Tofany (39 AD2d 710, affd without opn 30 NY2d 870), this department seemed to advocate the same strict stand that has been adopted in the First Department. The court ruled: "In his petition, petitioner claims, inter alia, that appellant’s determination was 'contrary to the facts and the law’. Under these circumstances the proceeding should have been transferred to this court for disposition in the first instance.” A similar ruling obtained in Matter of Koppel v Hults (20 AD2d 669). However, the lower courts in this department have not followed this rigid approach. In Matter of Stallone v Wyman (61 Misc 2d 416) Justice Irwin Shapiro did transfer a proceeding to the Appellate Division because there was an issue of substantial evidence, but not before he himself had first ruled upon and disposed of the other contention that the determination under review was arbitrary and capricious. Similarly, in Matter of Davis v Lavine (76 Misc 2d 984), the *431 Queens County Supreme Court acknowledged that there was an issue of substantial evidence, but did not transfer the case to the Appellate Division (p 985) "because the question [of substantial evidence] is not dispositive of the controversy.” Again, in Norton v Lavine (74 Misc 2d 590), the court refused to transfer the proceeding, stating that (p 593) "[t]he mere fact that a statutory hearing was held does not automatically invoke CPLR 7804 (subd. [g]) when the determination is sought to be reversed, annulled and set aside.” Incidentally, the transfer question has come up before in this department in a case where the administrative body was an environmental protection agency. (See Consolidated Edison Co. of N. Y. v Kretchmer, 68 Misc 2d 545.) However, in that case, there was no doubt that a transfer was necessary. The facts in the matter before me are different.
Interestingly, the question posed by CPLR 7804 (subd [g]) has been addressed in four recent cases in the Supreme Court of Nassau County, all decided by Justice Bertram Harnett, and still without any clear ground rules for these transfers. The first such case was Matter of Robertson v Lavine (71 Misc 2d 757). The petitioner did not raise the question of substantial evidence, but the respondent did, and moved to transfer the proceeding. Justice Harnett held that the respondent may not introduce an affirmative claim not made by the petitioner herself, and declined to transfer. The next case in Nassau was Matter of Garofano v United States Trotting Assn. (78 Misc 2d 33). It was held that the nature of the hearing, the requirement of its being held and the petitioner’s claim of lack of substantial evidence on the record mandated a transfer to the Appellate Division under CPLR 7804 (subd [g]). The emphasis on the word "claim” is mine and the significance of it will be seen later. The question came up again in Nassau in Matter of Williams v Lavine (77 Misc 2d 566) where Justice Harnett wrote that he would hear and decide the proceeding himself (p 567) "[s]ince the issues raised do not include a claimed lack of substantial evidence.” The emphasis again is mine. At this point, it would appear to be the position of the Nassau County Supreme Court that a claim that the determination under review was not supported by substantial evidence, would require a transfer to the Appellate Division. However, that position was weakened in the most recent case in that county, Matter of Kaplan v Kinzler (77 Misc 2d 507). The petitioner contended unequivocally that the determina *432 tion under review was unsupported by the evidence. Justice Harnett held that (p 509) "[e]ven if there are other points involved, once a CPLR 7803 (subd 4) question of substantial evidence is adjudged to be present, the entire matter must be transferred to the Appellate Division.” Once again the emphasis is added. The import of this last decision is that the question of substantial evidence may not be present merely because the petitioner claims it is present but rather it is present if the court decides it is. I also note that my learned colleague Justice Harnett feels that the Supreme Court cannot itself pass on objections in point of law, even though CPLR 7804 (subd [g]) seems to grant such authority, but must transfer the entire proceeding to the Appellate Division because of the presence of the substantial evidence issue.
Only one recent casé has been found in the Third Department but. it addresses itself to the question I have just discussed: isi it the court or the petitioner who decides whether there is an issue of substantial evidence? In Matter of Daigle v New York State Liq. Auth., (35 AD2d 901), the petitioners argued that their petition did not raise any issues as to substantial evidence, and that the only question involved is whether the determination of the Liquor Authority was arbitrary and capricious. The court disagreed with the petitioners’ own version of what questions were involved, and it held that the court itself will be the arbiter of what is a substantial evidence question and what is an arbitrary and capricious question.
The most pertinent recent decision in this area, with relation to the instant state of facts, has come from the Fourth Department. In Harris v Lavine (43 AD2d 894), the petitioner was given a hearing on her right to welfare assistance by the New York State Department of Social Services. Specifically, the question raised was whether the department had to provide money for household furnishings in the petitioner’s case, in accordance with certain provisions of the Social Services Law and in the implementing regulations of the department. After a full evidentiary hearing, the commissioner decided that the department did not have to provide such household furnishings. The Supreme Court transferred the matter to the Appellate Division, on the grounds that the evidentiary hearing gave rise to questions of substantial evidence. The Appellate Division, however, stated that the matter was improperly transferred. Quoting from a decision of the Court of Appeals, *433 the Fourth Department wrote: " 'Where [as here] the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court’s function is limited. * * * The administrative determination is to be accepted by the courts if it has warrant in the record and a reasonable basis in law. The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.’ We interpret this language, taken with the statement appearing in the same case that 'the construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld’, as a directive that the courts are not authorized to require a showing of substantial evidence to sustain a determination of the kind here called into question, but may inquire only as to the arbitrariness or unreasonableness of such a determination. Such "inquiry is properly made by the court at Special Term in. the first instance * * * There is no dispute about the facts.”
There is also a decision in this department which, although not factually identical to Harris v Lavine and the matter before me, is still theoretically analogous. In Matter of Board of Trustees of Inc. Vil. of Old Westbury v New York State Dept. of Environmental Conservation (67 Misc 2d 180), the village applied to the department for an exemption from its prohibition of the open burning of fallen leaves. Such an exemption may be granted by the promulgation of a new department regulation designating the village as an open-burning area. A full evidentiary hearing was held, and, when the department denied the application, the village sought to have that determination reviewed on the grounds that it wasn not supported by substantial evidence. The court held (p 182): "The promulgation of rules by a governmental agency is an administrative or legislative act, and can be judicially attacked only on the ground that it is arbitrary and capricious * * * The dispute relates to rule making and 'substantial evidence’ is not a factor.”
I feel that the two decisions last discussed should control the ruling in the instant case, since the facts are similar in kind.
In the instant matter, the determination of the Department of Environmental Conservation was that Hook Pond and the surrounding area are not tidal wetlands within the meaning *434 of the statute. Specifically, the commissioner referred to the statutory definition of tidal wetlands and concluded that the facts adduced by the petitioners did not demonstrate that Hook Pond falls within such definition. In other words, even if all the factual allegations made by the petitioners at the departmental hearing are deemed to be true, the department still does not interpret the statute as declaring Hook Pond a wetland.
Based on the decisions in Matter of Daigle v New York State Liq. Auth. (35 AD2d 901, supra) and Matter of Kaplan v Kinzler (77 Misc 2d 501, supra), I hold that the question of whether the substantial evidence issue is present is a question to be decided by the court, and not by the petitioners. In other words, just because the petitioners claim that a question of substantial evidence is present, does not make it so. Furthermore, on the authority of Harris v Lavine and Matter of Board of Trustees of Inc. Vil. of Old Westbury v New York State Dept. of Environmental Conservation (supra), I find that the determination sought by these petitioners to be reviewed involves nothing more than the interpretation of a statute by the agency whose function it is to do so, and that there are no questions of fact or of substantial evidence. Accordingly, I hold that Special Term of this court does have jurisdiction to hear and dispose of this article 78 proceeding and it does not have to be transferred to the Appellate Division under CPLR 7804 (subd [g]).
This holding means that I do not reach the second perplexing question in this area; i.e., whether, if there were a question of substantial evidence, I should have transferred the entire proceeding, or whether I should have decided the ^questions of law and transferred only the substantial evidence issue. I respectfully suggest that CPLR 7804 (subd [g]) be clarified either by the Legislature or by the appellate courts at the earliest opportunity.
Before leaving this problem I should also point out that one case in the Fourth Department held specifically that a proceeding to review a full evidentiary hearing conducted by the New York State Department of Environmental Conservation does not have to be transferred to the Appellate Division. (Matter of Canandaigua Lake Pure Waters Assn. v New York State Dept. of Environmental Conservation, 70 Misc 2d 265, affd without opn 39 AD2d 821.) The court based its decision on the fact that the administrative hearing involved there was a *435 discretionary hearing and not a hearing that the department was required by law to hold. However, this distinction as a basis for deciding whether or not a case must be transferred has been disapproved and apparently discarded in lower court decisions in this department (see, e.g., Matter of Kaplan v Kinzler, supra), and thus I feel that the decision not to transfer can be bottomed on stronger grounds, as I have already discussed.
In connection with the question of the transferability of this article 78 proceeding, there are additional considerations which reinforce my decision that the matter should be disposed of in this court. Certain statutes confer authority on the Supreme Court to review even questions of substantial evidence in article 78 proceedings; for example, subdivision 7 of section 267 of the Town Law, relating to review of ¡decisions of town boards of zoning appeals. (See Matter of Fasani v Rappaport, 30 AD2d 588; Matter of Circle Cts. v Lane, 29 AD2d 620.) There are similar provisions in the Tidal Wetlands Act. For example, subdivision 3 of section 25-0201 provides for a hearing on the classification of certain lands as tidal wetlands, following an inventory by the Department of Environmental Conservation. Subdivision 5 of that statute then states that any person aggrieved by an order entered as the result of such a hearing may bring an article 78 proceeding "in the supreme court for the county in which the tidal wetlands are located.” The same provision is found in subdivision 3 of section 25-0202, relating to a proceeding to review a determination that the wetlands moratorium applies to a particular area; in section 25-0404, relating to a proceeding to review a determination to issue or deny a hardship permit; and in section 25-0405 relating to proceedings to review a determination of the amount of money to be paid to the public or private owner of wetlands to be affected. I am well aware that the hearing below was not a hearing under article 25, but was rather a discretionary hearing permitted under the general provisions of the Environmental Conservation Law. I am also aware that the provisions of article 25 do not specifically state, as does the Town Law, that this court shall itself determine all questions which may be presented for determination. However, it can certainly be argued that, since the Legislature took the trouble to specify that proceedings to review determinations concerning tidal wetlands must be brought in the county where the wetlands are located, it is certainly a *436 supportable inference that the Legislature intended Special Term to consider and dispose of all the questions raised.
I also point out that the question of transferability of this matter was raised by the court itself, all parties apparently satisfied to have this matter resolved in its entirety in this court. In fact, numerous inquiries received by my staff from one of the defendants have indicated that time is of the essence in resolving this matter, and a transfer to the Appellate Division would necessarily delay a decision.
A third consideration is that the article 78 proceeding is effectively joined, in fact if not in law, with the plenary action for injunctive relief. This was precisely the situation in Matter of M.H.G. Enterprises v Furness (44 AD2d 531), and Special Term transferred both the article 78 proceeding and the plenary action to the Appellate Division. However, the First Department was constrained to remand the plenary action (p 532): "The parties are the same in interest, though reversed as to plaintiff, and defendant, as those in the article 78 proceeding, and the issues are related, but there is ho warrant in law for consideration of this motion in the Appellate Division as there is, pursuant to CPLR 7804 (subd [g]), for transfer of the related article 78 proceeding. It must therefore be returned for consideration in the proper forum.”
As it can readily be seen, to have the article 78 proceeding heard in the Appellate Division while the application for injunctive relief is being heard in this court, on inextricably interwoven issues of fact and law, would be somewhat impractical, to say the least. The effect would be that I would hold in abeyance any decision on the action before me until the Appellate Division had resolved certain questions of law in the article 78 proceeding, which would then be binding in the plenary action.
I want to emphasize my awareness that none of the three considerations I have just discussed would be sufficient, either by themselves or taken together, for this court to retain jurisdiction of the article 78 proceeding where it was otherwise clear that the matter must be transferred. However, since I have first determined that there is a sound legal basis not to transfer the matter, I point out these ancillary considerations as factors that reinforce my decision on the law.
I will now turn to the other procedural problems raised in this litigation, and I will deal with the simplest ones first.
The defendants contend that the article 78 proceeding *437 should be dismissed because the action for an injunction is pending, and the action for an injunction should be dismissed because the article 78 proceeding is pending. As all the parties will see, one of these matters is going to be dismissed in this decision, thereby eliminating that objection.
With respect to the question whether the plaintiffs may introduce new evidence in this litigation that was not introduced at the administrative hearing, I will allow all such evidence in order to afford the plaintiffs the benefit of every doubt on questions of fact, and thus decide the case solely on the law.
The defendants also point out that, pursuant to subdivision 5 of section 25-0201 of the Environmental Conservation Law, an article 78 proceeding must be commenced within 30 days after the date of filing the order entered pursuant to the administrative decision. The defendants argue that since no such order was ever filed, there is no underlying grievance to which this proceeding can be addressed, and therefore the court lacks subject matter jurisdiction. However, as I have mentioned previously, the hearing officer below stated that the hearing was not held pursuant to any section of article 25, but rather pursuant to certain general sections of the Environmental Conservation Law. Similarly, the defendants contend that article 25 provides that an article 78 proceeding is the sole remedy for anyone aggrieved by a determination made under the provisions of that article, and thus the plaintiffs’ action for injunctive relief is barred. I might also add that section 71-2505 stipulates that the Attorney-General shall have the right to enforce article 25 by way of injunction, which may preclude injunctive relief as a private remedy. Again, it is not clear that the hearing below proceeded under article 25 at all. Thus, the arguments of the defendants based on any of the provisions of article 25 are rejected.
The next procedural question involves the Statute of Limitations for article 78 proceedings. The defendant Amann, who is not a party to the article 78 proceeding, seeks to bring himself within the purview of the four-month Statute of Limitations contained in CPLR 217 with reference to such proceedings. Since this defendant is named only in the plenary action for injunctive relief, clearly the Statute of Limitations for article 78 proceedings does not apply to him, and his motion to dismiss the action is denied.
Turning now to the contention of the planning board in the *438 article 78 proceeding that CPLR 217 is a bar, I must point out that that statute is not the applicable one. The Statute of Limitations for the institution of an article 78 proceeding to review a determination of a village planning board is contained in section 7-740 of the Village Law, and it states that such a proceeding must be instituted "within 30 days after the filing of the decision in the office of the board.” In the instant matter, since the planning board’s decision was made in January, 1974, and the article 78 proceeding was not commenced until August, 1974, the proceeding was not instituted within the statutory period. However, at least in article 78 proceedings, the various statutes of limitations are not absolute bars and can be extended (Matter of Roberts v County Ct. of Wyomhig County, 39 AD2d 246). The corporate petitioner, upon learriing of the initial ruling of the Department of Environmental Conservation and the planning board’s approval of the construction plans, did not abandon its, opposition but immediately requested an evidentiary hearing by the department. Naturally, no proceeding could have been brought to' review the outcome of that hearing, until the outcome was announced in June, 1974. It has been held that "[t]he doctrine of exhaustion of administrative remedies requires that the petitioner must first exhaust her administrative remedies before resort to judicial review.” (Matter of Coffee v Board of Educ. of City of N. Y., 65 Misc 2d 931, 933; see, also, Matter of Perosi Homes v Maniscalco, 15 AD2d 563; Matter of Scarsdale-Harney Corp. v Briante, 11 AD2d 777.) Accordingly, I hold that the action of the corporate petitioner in seeking a full hearing before the Department of Environmental Conservation rather than instituting this proceeding sooner was in conformity with the doctrine of exhaustion of administrative remedies, and the petitioner should not be penalized for it. The motion by the Planning Board of the Village of East Hampton to dismiss the article 78 proceeding against it is denied.
The most difficult procedural question raised by the defendants is the standing of the parties to bring this action and proceeding. I will deal first with the standing of the corporate plaintiff, The Group for America’s South Fork, Inc.
The corporate plaintiff is a conservation group allegedly composed of about 700 homeowners on the South Fork of Eastern Long Island. It is not alleged that any of those members, except the two coplaintiffs, live in the immediate *439 vicinity of Hook Pond, nor is it claimed that the corporation itself owns any land near Hook Pond or anyplace else. The defendants argue that this plaintiff is disqualified because it does not own any property that would be affected by the proposed construction, and also because it has not shown that either the corporation itself or any of its members will suffer economic damage as a result of the proposed construction. However, these rules for standing to sue evolved through cases involving zoning questions, and the rules are not the same for standing to sue in conservation or ecology cases. Even the plaintiffs cite only two nonzoning cases, Matter of Procaccino v Steward (60 Misc 2d 551, revd on other grounds 32 AD2d 486, affd 25 NY2d 301), and Matter of Helms v Diamond (76 Misc 2d 253). The Procaccino decision is applicable only insofar as the court was impressed with the public interest sought to be protected by the plaintiffs’ action, but it is factually distinguishable in that the subject matter of the proceeding was the appropriateness of State-wide Blue Cross rate increases. The second case is likewise distinguishable, even though it was a conservation matter, in that the group whose standing to sue was challenged was not an original petitioner in the proceeding, but was permitted to intervene under CPLR 7802 (subd [d]). The bases for permissive intervention are broader than they are for standing to originate the proceeding.
The question of the standing to sue of conservation and ecology groups has been thoroughly discussed in two recent decisions of the United States Supreme Court: Sierra Club v Morton (405 US 727) and United States v SCRAP (412 US 669).
In Sierra Club v Morton, the United States Forest Service had given permission to build a recreational resort in the Sierra-Nevada Mountains in California. The Sierra Club instituted an action for a declaratory judgment and for an injunction, as a membership corporation with (p 730) "a special interest in the conservation and the sound maintenance of the national parks, game refuges and forests of the country.” The court framed the question before it as follows (p 734): "[W]hat must be alleged by persons who claim injury of a noneconomic nature to interests that are widely shared.” The court observed, preliminarily, that harm to one’s aesthetic and environmental well-being is a justiciable injury. However, it added, the party seeking review must himself be among the *440 injured. Specifically, the court wrote (p 735): "The Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents.”
The court went on to say that some lower courts have conferred standing to sue (pp 738-739) "upon organizations that have demonstrated 'an organizational interest in the problem’ of environmental or consumer protection. * * * It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review * * * But a mere 'interest in a problem’, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected’ or 'aggrieved’ ”. Thus, the court held that the Sierra Club lacked standing to sue in the case before it. However, the court made a significant observation portentious of things to come in a footnote to the decision. It was noted that the club specifically declined to rely on its individualized interests as a basis for standing, and that the club was not barred from amending its complaint to assert such interests in the court below. The suggestion was obvious.
The situation envisioned by the footnote became a reality the following year in United States v SCRAP. In that case, the Nation’s major railroads had requested and been granted a rate increase by the Interstate Commerce Commission, in the form of a 2.5% surcharge on freight rates. Various environmental groups, including SCRAP, opposed the surcharge on the grounds that it would "discourage the use of 'recyclable’ materials, and promote the use of new raw materials that compete with scrap, thereby adversely affecting the environment by encouraging unwarranted mining, lumbering, and other extractive activities. The members of these environmental groups were allegedly forced to pay more for finished products, and their use of forests and streams was allegedly impaired because of unnecessary destruction of timber and extraction of raw materials, and the accumulation of otherwise recyclable solid and liquid waste materials.” (412 US 669, 676.)
The group known as SCRAP was an unincorporated associa *441 tion of five law students whose alleged purpose was to enhance the quality of the human environment for its members and for all citizens. The association claimed that each of its members would suffer economic, recreational and aesthetic harm directly as a result of the adverse environmental impact of the proposed railroad freight rate structure. The group went on to allege that they would be caused to pay more for finished products, and that the action sought to be enjoined would impair their use of the forests, rivers, streams, mountains and other natural resources around the District of Columbia, where they attended school, and around their homes; and that it would also impair their enjoyment of camping, hiking, fishing, sightseeing and other recreational and aesthetic activity. The court, in a brief opinion, simply repeated the guidelines laid down in Sierra Club v Morton, and concluded that, since the SCRAP group did allege direct environmental injury upon its members, it had standing to sue.
The relationship between the SCRAP case and the instant matters is clear. It would be impossible for the members of the SCRAP group to show any definite or direct connection between the action sought to be enjoined and the resultant ecological harm to them. However, allegations of the possibility of such harm were held sufficient, at least to defeat a motion to dismiss. In the instant matter, the corporate plaintiff alleges that at least some of its members live close to the Hook Pond area, and that they visit and use the area for aesthetic and recreational enjoyment. I feel that the possibility of ecological harm to such members of the plaintiff corporation is at least as realistic as the possibility of such harm alleged by the members of SCRAP. Accordingly, I hold that the corporate plaintiff Group for America’s South Fork, Inc. has standing to institute both the article 78 proceeding and the plenary action for injunctive relief herein.
Turning now to the standing to sue of the two individual plaintiffs, since they are in fact nearby landowners in the Hook Pond area, their allegations of the possibility of ecological harm are clearly sufficient to give them standing to sue, according to the Supreme Court decisions discussed above. However, the defendants raise another disability afflicting these plaintiffs, namely, that they were not parties to the administrative proceeding below.
This contention does have merit. The defendants point to *442 the decisions in Matter of Mount Hope Development Corp. v James (233 App Div 284, affd without opn 258 NY 510), and Matter of Jonas v Board of Standards and Appeals of City of New Rochelle (155 NYS2d 506, affd 3 AD2d 668). In each case, the court noted that the petitioners were strangers to the administrative proceeding, were not parties to it, had not intervened, had not attempted to do so, did not appear, and did not afford themselves of the opportunity to litigate the issues they want to litigate now. To the same effect were the decisions in Matter of Browning v Bryant (178 Misc 576, affd 264 App Div 777) and Matter of Goldstein v State Comr. of Correction (182 Misc 695). Although these decisions are not of recent vintage, they have not been discredited or modified by later decisions and they must be accepted as the law. The plaintiffs have cited no authority in opposition to this particular contention, and, in fact, have not even mentioned it in any of their supporting papers. Accordingly, the motion by the defendants to dismiss the article 78 proceeding as to the plaintiffs Dorothy Case O’Brien and llene O. Wolff is granted. However, I would remind all parties that this proceeding is still viable with the Group for America’s South Fork, Inc. as plaintiff. Moreover, the disability of the plaintiffs O’Brien and Wolff to maintain the article 78 proceeding does not apply to the action for injunctive relief, and they are to remain as plaintiffs in that action.
Having disposed of all the various procedural questions in these two matters, I will turn now to the substantive considerations involved. At this point, I will hold in abeyance any questions about the injunction action, and I will deal exclusively with the article 78 proceeding. The substantive issues there can effectively be framed in the language of CPLR 7803 (subd 3): whether the determination of the Department of Environmental Conservation "was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion”.
The sole purpose of the evidentiary hearing conducted by the department was to determine whether or not Hook Pond and the surrounding area fit within the definition of "tidal wetlands” contained in section 25-0103 of the Environmental Conservation Law. That statute reads:
" 'Tidal wetlands’ shall mean and include the following:
"(a) those areas which border on or lie beneath tidal waters, such as, but not limited to, banks, bogs, salt marsh, swamps, *443 meadows, flats or other low lands subject to tidal action, including those areas now or formerly connected to tidal waters;
"(b) all banks, bogs, meadows, flats and tidal marsh subject to such tides, and upon which grow or may grow some or any of the following: salt hay (Spartina patens and Distichlis spicata), black grass (Juncus Gerardi), saltworts (Salicornia ssp.), sea lavender (Limonium carolinianum), tall cordgrass (Spartina pectinata and Spartina cynosuroides), hightide bush (Iva frutescens), cattails (Typha angustifolia and Typha latifolia), groundsel (Baccharis halmilifolia), marsh mallow (Hybiscus palustris) and the intertidal zone including low marsh cordgrass (Spartina alterniflora).”
With these criteria in mind I will now summarize the testimony taken at the hearing. In so doing, I shall, as I stated earlier, accept the plaintiffs’ version of the facts except, of course, the conclusions of the plaintiffs’ expert witnesses that the Hook Pond area is a tidal wetland. That is a legal conclusion.
As indicated above, there are two general criteria for determining whether an area is a tidal wetland: the "tidal waters” criterion and the "botanical” criterion. I will first deal with the testimony relating to the botanical criterion.
According to the testimony elicited at the hearing and in the affidavits of plaintiffs’ experts submitted in support of the instant action and proceeding, there are as many as five types of marine plant life now growing in the Hook Pond area that are named in the statute. However, even the plaintiffs’ experts concede that all the plant life in question can survive in fresh water alone, as well as in salt water, although it could not have colonized in fresh water alone. None of the experts was able to answer either of these two questions: (1) how long such plant life is able to survive in fresh water alone after the salt water in which it originally colonizes has disappeared altogether; or (2) what quantum of salt water, if any, is necessary to enable such plant life to continue to exist. The position of the department as to the efficacy of botanical criterion to define "tidal wetlands” is that (1) botanical evidence cannot be determinative in and of itself precisely because the plant life used as criteria can at least exist in both fresh water and salt water combined; and (2) the presence of the specified plant life in or on "banks, bogs, meadows, flats and tidal marsh” must be coupled with a finding that such areas are also "subject to *444 such tides” meaning "subject to tidal action”. Since the Hook Pond area is not now subject to tidal action, concludes the department, the mere presence of the plant life named in the statute will not sustain a classification of the area as "tidal wetlands”.
With respect to the tidal waters criterion, the plaintiffs argue that, while the Hook Pond area may not now be subject to tidal action, it is an area that was "formerly connected to tidal waters”. In this connection, the plaintiffs’ evidence is as follows.
The distance between Hook Pond and the Atlantic Ocean is 350 to 400 feet. Some years ago, prior to about 1930, the pond was connected to the ocean. There was a "gut way” between them, deep enough in which to wade up to the knees. However, that gut way sometimes created quicksand, and thus, around 1930, an underwater pipe was installed between the pond and the ocean which apparently eliminated or at least began to eliminate the natural overland connection between them. The plaintiffs’ own experts concede that no such overland connection has existed for at least the last 30 years. In 1957 or 1958, the old pipe was removed and a new one was laid. Between 1930 and 1958, the ocean would occasionally back up into the pond through the pipe. However, this has not happened since the new pipe was installed, because the ocean is now about three and a half feet lower than the pond, and the new pipe has shut-off valves to keep the ocean water out whenever the ocean rises to a level higher than the pond because of storms or unusually high tides.
There was also testimony with respect to occasional, temporary overland connections between the pond and the ocean during severe storms and unusually high tides. This did happen several times each year even after the original pipe was installed about 1930. However, when the new pipe was installed about 1958 the eight-foot barrier beach between the pond and the ocean was increased by the erection of an artificial dune approximately 12 feet higher than the then existing land. This dune is about 100 feet wide at its base and 50 feet wide at the top and is now about 20 feet above the level of the ocean. Thus, since that time, there have been no overland breakthroughs at all.
Based on this testimony, the hearing officer submitted the following report to the department, including conclusions and *445 a recommendation, and the report was adopted by the department as its own conclusions and recommendation.
"conclusions
"1. Hook Pond is a fresh body of water which is not now subject to tidal action, and which has been regulated by man for a long period of time.
"2. Whether or not Hook Pond was ever directly subject to tidal action is indeterminate based on the data available at this time but it appears that fresh water flowed or seeped from the pond to the ocean in the past. The warmer water reported in the gut indicated that the water was from the pond and that the flow was intermittent because the gut was at times damp or contained quicksand.
"3. The definition of tidal wetlands set forth in the statute is unclear. The use of the phrase, 'including those areas now or formerly connected to tidal waters,’ in the definition makes the term so all inclusive with respect to geography and chronology that it is not in any way definitive. Those areas which are or were connected naturally or artificially to tidal waters, even though not exposed to any tidal fluctuation themselves, could be considered within the definition as could areas which were submerged in geological past. To include all such areas no matter how near to or far from tidal waters does not appear to be the intent of the law. The intent of the law evidently was to include those areas which were naturally subject to tidal action in the recent past and which still retain some of the characteristics of wetlands.
"4. The plant species observed at Hook Pond which are included among the species listed in the definition of tidal wetlands contained in Section 25-0103 of the Environmental Conservation Law are not specific indicators of tidal wetlands in that the plants can exist in either fresh water, salt water or waters of varying salinity.
"5. The evidence does not establish that Hook Pond was formerly naturally connected to tidal waters as provided in the definition of tidal wetlands set forth in Section 25-0103-1(a) of the Environmental Conservation Law. There is no evidence that Hook Pond has ever been connected to tidal water in the recent past.
"6. Hook Pond does not fall within the second portion of the definition of tidal wetlands set forth in Section 25-0103-l(b) of *446 .the statute because it is not subject to tidal action and there is no evidence that it has ever been subject to tidal action.
"recommendation
"The Department should not consider Hook Pond to be a tidal wetland.”
I will turn now to the question whether this determination by the department was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion.
The plaintiffs contend that the investigation conducted by the department was not thorough; that the hearing officer disregarded the testimony of the plaintiffs’ witnesses; and that the department’s conclusion ignored the plain meaning of the statute. As to the second contention, I have already held that, viewing all the testimony in the light most favorable to the plaintiffs, it is still not sufficient even to raise a question of substantial evidence. As for the plain meaning of the statute, I will discuss that more at length below.
I now turn to the plaintiffs’ argument on the effect of evidence which was not adduced at the hearing, but which should have been. The plaintiffs cite five cases in support of their proposition that the investigation and hearing conducted by the department was inadequate. Two of these were Federal court cases: Scenic Hudson Preservation Conference v Federal Power Comm. (354 F2d 608) and Greene County Planning Bd. v Federal Power Comm. (455 F2d 412), both of which held that the administrative record was incomplete. In the first case, the petitioners sought to vacate a determination of the Federal Power Commission which granted permission to the Consolidated Edison Company to undertake a hydroelectric project at Storm King, New York. That plant was to cost $162,000,000 and was to be the largest such facility in the world. The court wrote a 27-page opinion, most of which was devoted to reviewing the administrative record, and concluded that the commission did not make a thorough study of the possible alternatives to the proposed project. Similarly, in Greene County Planning Bd. v Federal Power Comm., the court, in a 15-page opinion, ruled that the commission’s record was inadequate to approve the project' of the New York State Power Authority to construct a high-voltage transmission line, which would include numerous towers and generating plants. Patently, the construction projects involved in those two Fed *447 eral cases were mammoth in size and in terms of their potential impact on the environment. In contrast, the builder in the matters before me proposes to erect 26 one-family residential dwellings, each on a one-acre lot; a road 50 feet wide and about 3,000 feet long; and a bridge over the northern tip of Hook Pond. There are already five other bridges over the pond and, while the area surrounding the pond would be altered, the pond itself would not be touched at all.
The plaintiffs also rely on the case of Matter of Brady v City of New York (22 NY2d 601). There, the petitioner was the widow of a police officer, who was seeking accidental death benefits. The Police Pension Board ordered a departmental investigation, which recommended that the request be denied (p 604), "based principally on a conclusory statement contained in a police department report made on the date of the accident to the effect that Sergeant Brady had been off duty at the time of his death.” There was no evidentiary hearing held at all. The pension board then referred the matter to the medical board of physicians, which made no further investigation whatsoever, but merely adopted the department’s recommendation. In comparing the investigation conducted in the Brady case with the record before me, consisting of 213 pages of testimony plus a number of documents, I hold the. decision in Matter of Brady v City of New York to be inapplicable on its facts.
The plaintiffs also cite Matter of Dillard v New York City Tr. Auth. (34 AD2d 995), where a transit policeman was dismissed from employment after, a hearing. It appeared that the petitioner had suffered a physical injury and was assigned to "restricted duties” because of it, and then was discharged because, according to the Transit Authority, it was the authority’s "established” policy to replace such patrolmen with civilian employees. However, the court ruled that it did not appear on the record whether this "policy” was ever applied to anyone other than the petitioner. The record in Dillard contained clear implications of discrimination, and it bears no resemblance to the record before me.
Finally, the plaintiffs cite Matter of Walsh v Spadaccia (73 Misc 2d 866), in which the petitioner challenged the town board’s approval of a site plan for 168 apartment units. At the trial, it was brought out that there was a town development plan which the board was required to consider prior to approving site plans, which was not done. The development plan *448 provided that building sites were not to be approved until it was shown that there would be adequate public sewerage facilities. The problem of sewerage was not considered by the town board, and it also developed at the trial that there would indeed be a sewerage inadequacy under the proposed plans. It was further adduced that the board had conducted no tests to ascertain whether the proposed sewerage system would pollute nearby Lake Mohegan. Finally, it was discovered that none of the members of the town board had. ever even visited the building site. Once again, I fail to see any factual similarity between that situation and the Hook Pond matter here.
The question that comes to my mind is what more the plaintiffs would expect of the Department of Environmental Conservation before coming to a determination. A qualified representative of the department inspected the site in the summer of 1973 and made salinity tests. The plaintiffs emphasize the fact that this was the sole scientific test conducted by the department. However, the plaintiffs themselves were given a full evidentiary hearing at which they were afforded every opportunity to elicit the testimony of their own expert witnesses and to set fdrth the results of the tests that they themselves conducted. It turned out that their salinity test produced the same result as the department’s salinity test: no trace of salt. The plaintiffs contend that further, much more extensive testing is necessary, but they have not shown facts why this is so. They seem to suggest that the department can make no proper finding at all in this case until the entire inventory of wetlands is completed, sometime about one year from now, and that, in the meanwhile, we should assume that the Hook Pond area is a wetlands and prohibit any development of the area. I do not agree with this reasoning, nor do I agree that the investigation and the hearing held by the department were inadequate.
Finally, the plaintiffs contend that the department’s interpretation of the statutory phrase "areas now or formerly connected to tidal waters” to mean recently formerly connected is erroneous as a matter of law. The plaintiffs maintain that there is no implied time limitation on the word "formerly”. Since the intended meaning of this phrase has not yet received any judicial interpretation in this State, the plaintiffs have cited a Delaware statute and, purportedly, a New Jersey statute in support of their argument. The Delaware statute (Del Code 7, § 6603), defines wetlands to include those areas *449 which now or in this century have been connected to tidal waters. Although this statute, like most wetlands legislation, is quite new and has not received any judicial interpretation, it must be conceded that Hook Pond would appear to be a wetlands within the meaning of the Delaware statute. However, a review of wetlands laws in the several other States that have them indicates that the Delaware statute is one of a kind in the meaning of "formerly connected” waters.
In New Jersey the plaintiffs cite the decision in O’Neill v State Highway Dept. (50 NJ 307), which in turn contained an interpretation of section 18:10-5 of the New Jersey Statutes. The plaintiffs contend that the court, and the statute, interpret "formerly connected” wetlands to mean lands that were connected at any time in the historical past to tidal waters. However, that section of the New Jersey Statutes does not define "wetlands”; it defines "tidelands”, in the context of public ownership of such lands as opposed to private ownership. The court in O’Neill discussed the question of an individual’s claim of title to such lands, as opposed to the claim of the realm, and the courts have always evaluated such claims within a historical framework. The New Jersey Coastal Wetlands Act is sections 13:9A-1 to 13:9A-10 of the New Jersey Statutes. The definition of "coastal wetlands” is found in section 13:9A-2 and it encompasses, generally, "land subject to tidal action * * * including those areas now or formerly connected to tidal wetlands whose surface is at or below an elevation of 1 foot above local extreme high water”. In other words, applying the New Jersey definition to Hook Pond, the level of the pond would have to be no more than one foot above the level of the ocean, or below the level of the ocean, in order for Hook Pond to be a coastal wetland. However, Hook Pond was found to be at an elevation SVz feet higher than the ocean. Thus, under the New Jersey statutory standard, Hook Pond would not be a wetland.
The State of Maine also has a coastal wetlands statute (Maine Rev Stat Ann, tit 12, § 4701), and its definition of "wetlands” includes land "above extreme low water which is subject to tidal action or normal storm flowage at any time excepting periods of maximum storm activity.” If this statute were applied to Hook Pond, those instances of "maximum storm activity” before the dune barrier was erected, when ocean water would be blown overland into the pond, would not be a basis for classifying the pond as a wetland.
*450 The Maryland statute (Maryland Code, art 66C, § 719, subd [b]) defines "private wetlands” as land "bordering on or lying beneath tidal waters, which are subject to regular or periodic tidal action and which support aquatic growth”. Thus, the Maryland law does not even include the "formerly connected” element.
The State of Rhode Island has established an entirely different standard for defining wetlands. Subdivision B of section 46-23-6 of the General Laws of Rhode Island provides that the State Coastal Resources Management Council can control land uses of wetland areas whenever such uses "are related to a water area under the agency’s jurisdiction, regardless of their actual location.”
Finally, I note that the Federal Coastal Zone Management Act uses the sole criterion of salinity to determine areas within its purview. The statute (US Code, tit 16, § 1453, subd [b], par [2]) defines "coastal waters” as "those waters, adjacent to the shorelines, which contain a measurable quantity or percentage of sea water, including * * * ponds”.
As I mentioned at the very outset, the question at the core of all the contentions in the article 78 proceeding is simply whether or not the determination of the Department of Environmental Conservation can be sustained as a matter of law. Where an interpretation of a statute is made by the agency having the responsibility to interpret and enforce that statute, a presumption of regularity attaches to the interpretative process, and this theorum has been specifically applied to proceedings of the Department of Environmental Conservation (Matter of Gae Farms v Diamond, 40 AD2d 909). The court cannot substitute its judgment for that of the agency, and may not annul the agency’s determination, unless it is arbitrary and capricious or otherwise contrary to law. I find that the determination of the Department of Environmental Conservation upon the hearing was not arbitrary or capricious and was not contrary to law. Accordingly, that determination is affirmed.
The decisions reached herein leave the parties in the following status. The article 78 proceeding is dismissed as to all respondents for the reasons set forth herein. In the plenary action for injunctive relief, the plaintiffs’ motion for a preliminary injunction is denied, since they have failed to meet the first of the three tests for the right to such relief; i.e., they have not shown any probability of ultimate success in the *451 action. The motions of the defendants Barnes Construction Co. and Amann to dismiss the action on various procedural grounds are denied, for the reasons set forth herein. Those motions to dismiss are also denied on substantive grounds. The dismissal of the article 78 proceeding merely affirms the determination of the department that the Hook Pond area is not a tidal wetlands, and therefore not subject to the department’s jurisdiction. This does not preclude the plaintiffs from trying to show at a full trial before this court that the actions sought to be enjoined would be ecologically harmful to them.
The temporary restraining orders contained in the orders to show cause granted on August 7, 1974 are hereby vacated.
Submit one judgment and order.