OPINION OF THE COURT
Robert F. Doran, J.
The plaintiffs herein are New York State’s six off-track betting corporations (hereinafter OTBs). Each, except New York City OTB, is a public benefit corporation organized in the early 1970’s under article V of the Racing, Pari-Mutuel Wagering and Breeding Law. New York City OTB was organized under article VI. Each operates several betting parlors in a statutorily defined region where it is authorized to offer pari-mutuel wagering on the races conducted by the New York Racing Association (hereinafter NYRA) at Aqueduct, Belmont and Saratoga racetracks and other racetracks in New York State such as Finger Lakes, Monticello and Yonkers. There are other racetracks involved from which pari-mutuel wagering is accepted at only certain of the OTBs, such as Batavia Downs and Saratoga Raceway.
The defendant New York State Racing and Wagering Board (hereinafter Board) is a Board within the State’s Executive Department that has general jurisdiction over all horse racing and all pari-mutuel betting activities, both on-track and offtrack, in New York State and over all corporations, associations, and persons engaged therein. That jurisdiction is provided for in Racing, Pari-Mutuel Wagering and Breeding Law §101.
The defendant Board’s authority over off-track betting is set forth in Racing, Pari-Mutuel Wagering and Breeding Law § 520 (1) which provides: "1. The state racing and wagering board shall have general jurisdiction over the operation of all off-track betting facilities within the state, and the board shall issue rules and regulations in accordance with the provisions of this article in order to ensure the accomplishment of the purposes set out in section five hundred eighteen of this article.”
The NYRA, a private nonprofit racing association organized under Racing, Pari-Mutuel Wagering and Breeding Law § 202, was allowed to intervene as a defendant.
The Yonkers Racing Corporation (hereinafter Yonkers) which conducts live harness racing at the Yonkers Raceway was also allowed to intervene as a defendant. Yonkers was *528 incorporated under Racing, Pari-Mutuel Wagering and Breeding Law § 302.
The OTBs served an amended complaint for declaratory judgment and injunctive relief against the defendant Board. The basis for the action is the Board’s memorandum, dated October 8, 1991, which purports to implement a regulation adopted by the Board in 1983 (see, 9 NYCRR 5204.15). The regulation and memorandum seek to require the OTBs to restore to the betting public "missed pool” bets totalling $1,416,646. "Missed pool” bets are bets taken in by OTBs which for various reasons fail to be included in the track’s pari-mutuel betting pool and which are thus not used to calculate the payouts. When this happens the OTBs keep the bet proceeds if a wager was a loser and pay the State-wide pool price if the bet was a winner. Defendants argue that such a procedure tends to drive down the payout price to winners, both on-track and off-track. The untransmitted bets which were "losers” and which amounted to $1,416,646 occurred during the period from August 1, 1983 through the end of 1990.
The Board’s regulation (9 NYCRR 5204.15) allegedly attempts to afford bettors of the State a practical remedy when the OTBs take losing bets which fail to get into the track’s pari-mutuel pool.
"Pari-mutuel wagering” refers to a system or method of betting on horse races that appears to have been first devised and employed at the racetracks in and near Paris, France, about 120 years ago. The method was quickly adopted elsewhere and was in wide use in the United States when article I, § 9 of the New York Constitution was amended at the general election of 1939 to make the pari-mutuel method the only lawful form of wagering on horse races in New York State.
The essential feature of pari-mutuel wagering is that participants do not bet against the track or "house” (as they do, for example, in the case of roulette wheels and other forms of lawful casino gambling in Nevada and Atlantic City, New Jersey). Rather they wager against each other and determine the "odds” for an event, which are not known or knowable in advance, by their betting among themselves. The amounts that bettors place on the various possible outcomes are gathered into a pool. A fixed commission that is unaffected by the race’s outcome is deducted from the pool by the operator to *529 cover its expenses, meet the taxes imposed on the pool by New York State, etc., and the remainder (the "net pool”) is returned ratably to the successful bettors in proportion to the size of their winning bets. If many participants pick the prevailing horse (a "favorite”), the "payout” per dollar bet on that horse is low; if few do so (a "long-shot”), the "payout” per dollar wagered on the winning horse is higher. In the parimutuel method, it is important to the bettors, but immaterial to the track or other wagering operator, which horse wins. Compensated by the prescribed commission (a "sure thing,” so to speak), the operator does not take a "gambling” risk or seek to gain a "gambling” profit.
In pari-mutuel wagering, the operator functions as, in substance, a stakeholder of the bettors’ "at-risk” funds while the race is being run. In casino gambling, on the other hand, the bets are made between the "house” and the player. Either one can win or lose — each takes a "gambling” risk — on each particular spin of the wheel or roll of the dice. The "house” wins in the long run because it sets, in advance of any play, payout "odds” which, when combined with the long-run statistical probabilities as to outcomes, assure its ultimate success. This is also the case with illegal "bookmakers” of horse race wagers. Such operators are generally understood to pay track "prices” to their customers. But, to the extent that the bets in the illegal "book” depart from the proportions in the pool creating the track "price”, the bookmaker runs the risk of a "gambling” loss or he or she may achieve a "gambling” profit in addition to the gain implicit in the lawful commission charges that are reflected in the track "price”.
The basic parameters for pari-mutuel wagering in New York are set out in the Racing, Pari-Mutuel Wagering and Breeding Law (see, §§ 229 [governing bets at NYRA’s tracks], 318 [bets at harness tracks, such as Yonkers Raceway and Saratoga Raceway], 527 [wagers at OTB parlors]). The relevant provisions of section 527 are representative of all the cited sections, and it reads: "Each regional corporation conducting pif-track betting pursuant to sections two hundred twenty-two through seven hundred five of this chapter shall distribute all sums deposited in any pari-mutuel pool through such corporation to the holders of winning tickets therein, providing such tickets be presented for payment prior to April first of the year following the year of their purchase, less”.
What follows after the "less” in the preceding quotation (and in the analogous formulations of the other cited sections) *530 is a specification of the commission or retention rate from pools — 17% for nonexotic wagers, higher for particular types of exotic wagers — and detailed instructions as to how the retained commission is to be divided. The details vary from operator to operator, but, in all cases, a part goes to the State as a tax, a portion of the funds is dedicated to the purse moneys for participating horses, and some to one or another of the public benefit corporations that support activities beneficial to the State’s horse breeding industry. At the end, there is a residue that the operator keeps to finance its own business. In the case of the OTBs, they also make from their retentions statutorily prescribed payments to the tracks that stage the races that are the object of wagering at the OTB parlors.
The Racing, Pari-Mutuel Wagering and Breeding Law has, from the inception of off-track betting in New York, required that all wagers on a particular in-State race or betting event such as a daily double be combined into a single State-wide pool to assure uniform odds and a uniform payout price at all wagering outlets across the State. The OTBs are authorized by Racing, Pari-Mutuel Wagering and Breeding Law § 532 to impose, and all of them do collect, an additional "surcharge” on winning bets made at their parlors. This surcharge is calculated and applied after the determination of the uniform State-wide pay-off prices. In the case of NYRA races, this combining or pooling into a single State-wide pool is accomplished by the OTBs transmitting information as to wagers made at their betting parlors to NYRA’s central on-track wagering computer where it is combined with the comparable information generated by transactions at the betting windows at NYRA’s track. After the race is run and the results are declared "official” by the stewards who preside over the racing competitions (see, Racing, Pari-Mutuel Wagering and Breeding Law § 212), the computer determines, on the basis of the information about betting that they have received, the appropriate payout prices, which then are followed across the State.
In recent years, about 40% of the wagering on NYRA’s races has occurred at its tracks, the remainder at remote locations — the OTBs’ 280-odd parlors and some other tracks that are authorized to receive and display "simulcasts” (i.e., closed circuit television) of NYRA’s races and to take wagers on NYRA races. The NYRA track represents, by a very wide margin, the largest single site of wagering on NYRA races.
Each operator is responsible for redeeming the winning tickets that it has sold. Normally, one operator or another *531 (most frequently NYRA in the case of its races) will sell a higher proportion of successful tickets than the others and thus will require, to "cover” its obligations to winning bettors, an infusion from the proceeds of losing wagers made elsewhere (see, Racing, Pari-Mutuel Wagering and Breeding Law § 526 [5]). The operators "clear” their aggregate imbalances by wire transfers through the banking system on the date following each day of racing. The monies included in a State-wide pool are not collected together at one place or into one account, except notionally.
The nub of the "missed pool” problem is that OTBs’ bets sometimes fail to be included in the State-wide pools. On occasion, this may result from suddenly collapsed telephone poles with lines carrying data from an OTB facility. Another explanation is that data from the OTBs reaches NYRA’s computer and other track computers after betting has stopped, and the system is locked, at the start of a race. The legal papers from both sides devote considerable space to "finger pointing”. Suffice it to say that the reasons for the "missed pool” bets are irrelevant to the outcome of this lawsuit. The court does note that since the 1983 regulation was adopted and because of better processing equipment, the amount of the "missed pool” bets has markedly decreased.
As a consequence of the "missed pool” bets, the OTBs handle bets that do not get included in the State-wide parimutuel pool. The OTBs, in effect, take the "gambling” risk of "booking” the bets for themselves. If a bettor so "booked” loses, the OTB keeps his or her wager. If he or she wins, the OTB pays the pool price. The general effect of this procedure, albeit not the invariant effect in every instance that it occurs, is: (a) to reduce the amount that would have been payable to all winners had the wagers been included in the pool; and (b) to permit the OTBs to pocket amounts that properly should have accrued to successful bettors. The following offers a schematic illustration of the process.
Assume 100 $2 bets in the State-wide "win” pool on a particular race, of which 10 are winners. The total pool is $200. After the statutorily prescribed 17% commission (i.e., $34) is deducted, the resulting "net pool” of $166 produces a pari-mutuel pay-off of $16.60 for each of the 10 winning $2 tickets. These winners may include, and in the normal course do include, bettors at both the track and at OTB parlors.
Assume 10 additional $2 bets, all losers. If these wagers are *532 included in the State-wide pool, the total pool becomes $220 and the "net pool”, after deduction of the 17% commission, is $182.60. This makes each of the 10 winning bets worth $18.26. (The latter amount would be rounded, in practice, to $18.20 with the "breakage” of 6 cents being shared by the operator and the State in accordance with formulae spelled out in the Racing, Pari-Mutuel Wagering and Breeding Law.) If these additional 10 wagers are made at OTB parlors and are not included in the pool, the payout is $16.60 rather than $18.20 and the OTB pockets $16.60 ($20 less the 17% commission) that properly belongs to the winning bettors who are included in the State-wide pool mandated by the Legislature, but who are denied the avails of the losing bets that are kept by OTB.
If the hypothesized 10 additional bets included a higher proportion of winners (i.e., two or more) than the basic pool’s l-in-10, the inclusion of the additional bets in the pool would drive the winning price to a level below $16.60. The OTBs take the "gambling” risk, in any particular case, that they will have to pay out more on winning "unpooled” bets than they collect on all "unpooled” bets, losers plus winners. Under the regulation, the "gains” and "losses” are not offsetting. The regulation states that an OTB shall not net the losses it incurs in "booking” unpooled bets on one race against the gains it achieves through booking unpooled bets on another race. Operating experience demonstrates that the OTBs, by not pooling all of their wagers, achieve "gambling” gains at the expense of bettors far more frequently than they suffer "gambling” losses.
To illustrate what might happen to an OTB where there is a higher proportion of winners (i.e., two or more) than the basic pool’s l-in-10, and the additional bets do not reach the pool, the following example is given. Assume 10 additional bets which do not get into the pool and are "missed pool” bets. Assume further that all 10 bets at the OTB are winners. The OTB would still have to pay out on the basis of the track payout which was $16.60, but it would first take out of the $20 received for the 10 extra bets the statutory commission of 17% and further take out its surcharge which is about 7%. The payout to the bettors would be about $15.40. As a result, the OTB has a loss of $154 less $16.60 which is the net amount after the statutory commission of 17% of the bets made at the OTB. That loss would further be reduced by any portion of the $3.40 commission that remains with the OTB. *533 The net loss is never made up under the regulation and memorandum directive.
NYRA’s records show that, during the first nine months of 1991, it incurred an obligation to pay $553,195,103 on winning tickets it sold. This represents 84.60% of its on-track handle, showing that it "retained” from its bettors only 15.4% of the amount they wagered — a proportion well below the statutory commission. The "gap” was made up by $19,737,512 of settlements received from the OTBs and other participants in its pools.
This pattern, which has been consistent for many years, demonstrates: (a) that, on balance, OTBs’ proportion of winning tickets sold on NYRA races is below that of the Statewide pools as a whole; and (b) that OTBs will make a "gambling” profit at the expense of bettors on NYRA races if they withhold some of their wagers from the State-wide pools and "book” those bets themselves.
Recognizing the existence of this condition, the Board dealt with it in 1983 by adopting regulation 9 NYCRR 5204.15. The regulation imposes upon the OTBs the obligation to return to later pools the gains, as measured by standards laid down in the rule, that they extract from bettors as a group by not including some of their bets in the State-wide pools. In this way, the bettors (albeit not necessarily the exact same bettors) as a group have a chance to "win”, at a later time, what they are denied by the initial noninclusion. Again, it is important to note that the regulation prohibits OTBs from offsetting any losses that occur on a given race from "missed pool” bets against gains or profits it received on "missed pool” bets in other races.
Initially, the Board took no further steps to implement its regulation allegedly because of the lack of adequate computer facilities at the tracks. Software was finally developed to provide a solution to this "problem” across the State.
On October 8, 1991, the Board in a "memorandum” directed the OTBs to make available to bettors without further delay the $1,416,646 they had garnered from bettors by "missing” pools from the inception of 9 NYCRR 5204.15 through the end of 1990. Of this amount, $853,230 was derived from "missed pool” wagers on NYRA races and this amount was to be returned to bettors on NYRA races by including it in (and, in effect, "sweetening”) the pools on NYRA races to be run on Saturday, October 26, 1991. No claim has been made by the *534 OTBs that a memorandum directive is not a proper vehicle to implement the regulation in any event.
The OTBs commenced this action against the Board to declare that the Board did not have the authority or power to issue its regulation and memorandum directive. The OTBs also argue that the implementation of the Board’s regulation and directive will result in the unconstitutional payment of public funds to private persons and that the OTBs would be denied equal protection of the law and due process.
On or about October 18, 1991, OTBs by way of an order to show cause sought to enjoin the Board from requiring compliance with its memorandum directive of October 8, 1991, and further sought a declaratory judgment. On October 23, 1991, the return date of the order to show cause, NYRA and Yonkers sought by orders to show cause leave to intervene in this action as defendants. Such request was granted. The Board also agreed to defer its memorandum directive dated October 8, 1991, while the parties sought a resolution of the attack on the regulation and memorandum directive.
The court has reviewed the statutes cited as the Board’s authority to regulate and implement pari-mutuel betting facilities and determines that the Board does have broad powers to regulate. This precept is stated in Matter of Capital Dist. Regional Off-Track Betting Corp. v New York State Racing & Wagering Bd. (54 NY2d 154, 157-158): “The board has general jurisdiction over all horse racing activity, all pari-mutuel betting activity, and all persons and entities engaged in those activities (Racing and Wagering Board Law, § 201, subd 1, L 1940, ch 254, added L 1973, ch 346, as amd by L 1976, ch 92, § 7). In particular, the board has broad powers to regulate offtrack pari-mutuel betting facilities, including the power to issue rules and regulations (Off-Track Pari-Mutuel Betting Law, § 118, L 1940, ch 254, added L 1973, ch 346, as amd by L 1973, ch 414, § 4), to approve the plan of operation submitted by a regional corporation, such as petitioner (L 1973, ch 346, § 5), to approve the betting programs of those corporations (L 1978, ch 576, § 7), to oversee their accounting and record-keeping activities (L 1973, ch 346, § 8), and to resolve certain disputes between racetrack and off-track betting corporations (L 1973, ch 346, § 10). The legislative scheme demonstrates an intent to place ultimate supervisory and regulatory power in the State board.” (See, also, Finger Lakes Racing Assn.. v New York State Racing & Wagering Bd., 45 NY2d 471.)
*535 The court has also reviewed and finds proper the manner in which the regulation that became 9 NYCRR 5204.15 was published and enacted.
THE STATUTE OF LIMITATIONS PROBLEM
The defendants take the position that the court should not reach the merits of this controversy since the Statute of Limitations had run prior to the commencement of the action and the complaint therefore should be dismissed. First, defendants take the position that the action is wrongfully denominated a declaratory judgment action, and that, in reality, the action is a CPLR article 78 proceeding and the four-month Statute of Limitations for CPLR article 78 proceedings under CPLR 217 applies. The OTBs contend that no matter whether the action is denominated properly as a declaratory judgment action or whether it should be properly viewed as a CPLR article 78 proceeding, the appropriate Statute of Limitations on its face has long since run insofar as the adoption of the regulation is concerned. However, the OTBs contend, for various reasons, that the Statute of Limitations did not begin to run and the OTBs may properly challenge the regulation and the memorandum directive. The action was commenced within four months of the date of the memorandum directive of October 8, 1991. For the reasons that follow, the court determines that the OTBs are not prevented by any Statute of Limitations from pursuing the merits of this controversy.
The OTBs first contend that the Statute of Limitations in a CPLR article 78 proceeding is not an absolute bar and can be extended. The OTBs cite O’Brien v Barnes Bldg. Co. (85 Misc 2d 424, 438). That case relied upon Matter of Roberts v County Ct. (39 AD2d 246). However, the court cannot find in Matter of Roberts any statement to support the proposition that in a CPLR article 78 proceeding the various Statutes of Limitations are not absolute bars and can be extended. At most, Matter of Roberts stands for the proposition that where the CPLR article 78 proceeding is in the nature of prohibition, the Statute of Limitations might be extended under certain factual settings. The court concludes that it cannot be extended in this case.
The OTBs next contend that the Statute of Limitations is not a bar because there is a continuing obligation on the OTBs under the regulation and therefore the OTBs’ opposition to the regulation is not time barred no matter whether the *536 "action” is in reality and more properly a CPLR article 78 proceeding or is a declaratory judgment action. The OTBs contend the continuing obligation tolls the Statute of Limitations. The regulation places the burden of pooling bets on OTBs and requires them to pay at "the next available Statewide net pools” or otherwise the difference between its liability for a payoff and track settlement and the net pool after take-out. The OTBs cite Matter of Kenny v Loos (286 App Div 97, 99) for the proposition where the obligation is a continuing one on the part of the OTBs to turn the money over and the Board had a continuing duty to utilize the money for the bettors, the applicable Statute of Limitations is tolled.
The OTBs also take the position that the regulation was impossible of performance until the memorandum directive was issued on October 22, 1991. The OTBs point out that it was technically impossible to comply with the regulation and that it took almost nine years for the defendant Board to issue its implementing memorandum directive. The OTBs claim that the impact and prejudice of the regulation was not ascertainable until the implementing memorandum directive was issued and that, therefore, the Statute of Limitations did not begin to run until the implementing memorandum directive was issued on October 8, 1991. The OTBs cite Matter of Jewish Mem. Hosp. v Whalen (47 NY2d 331, 343) and Matter of Martin v Ronan (44 NY2d 374, 380-381).
The essence of those two cases is that a Statute of Limitations should not begin to run until those affected know the full extent of the prejudice to them and how it is to be actually implemented. It was not until the memorandum directive came forth that the OTBs knew the full extent of how and when the regulation was to be implemented. The court for those reasons concludes that any Statute of Limitations, whether it be for a CPLR article 78 proceeding or a declaratory judgment action, is not a bar to reaching the merits of this controversy.
THE VALIDITY OF THE REGULATION AND IMPLEMENTING MEMORANDUM DIRECTIVE
The OTBs concede that the Board indisputedly has broad powers. However, the OTBs contend that the Board did not have the power to issue the regulation and memorandum directive because they violate the Racing, Pari-Mutuel Wagering and Breeding Law. The OTBs contend that the regulation *537 and implementing memorandum directive violate the Racing, Pari-Mutuel Wagering and Breeding Law in several particulars.
The OTBs claim that there is a violation of the Racing, Pari-Mutuel Wagering and Breeding Law because the regulation and memorandum directive failed to allow OTBs to make up for losses where payments to winning bettors off-track exceed the portion of the pari-mutuel pool attributable to such bettors. The OTBs cite Racing, Pari-Mutuel Wagering and Breeding Law § 526 (5). However, the court determines that subdivision (5) of section 526 of the Racing, Pari-Mutuel Wagering and Breeding Law is of no help to the OTBs on the question of whether the entire regulation is invalid. That only covers the situation where bets actually get into the combined pool and where one operator will sell a higher proportion of successful tickets than the other and thus will require, to cover its obligations to winning bettors, an infusion of proceeds from the losing wagers made elsewhere. Subdivision (5) of section 526 cannot be stretched to include the situation of "missed pool” losses which do occur on occasion, although on an over-all basis the OTBs show a profit or gain from "missed pool” bets.
The OTBs also claim that the regulation and memorandum directive violate Racing, Pari-Mutuel Wagering and Breeding Law § 527 in that they fail to allow for OTBs to receive statutory commissions from the monies ordered to be returned to the bettors and deprive participating counties of revenues which would otherwise flow to them. The court does not agree that the OTBs are deprived of any commissions. Where the OTBs have gains or profits "missed pool” bets, the statutory commissions are taken out and it is only the balance that is sought to be given back to the bettors under the regulation and memorandum directive. The OTBs also argue that the regulation and memorandum directive also violate section 526 (2) of the Racing, Pari-Mutuel Wagering and Breeding Law because they placed the burden of pooling bets solely on the OTBs. Subdivision (2) of section 526 merely directs that the track operator allows OTBs to use space and facilities and commands the track operator not to fail to cause off-track wagers to be combined with on-track wagers into a single pool, providing, however, that the off-track wagering information is transmitted to the track in an accurate and timely fashion. Even if there were instances as alleged by the OTBs where it was the track operator which failed to incorporate bets into a *538 single pool after the bets were timely transmitted from the OTBs, subdivision (2) of section 526 of the Racing, Pari-Mutuel Wagering and Breeding Law would not be a bar to the Board’s power to order the profits or gains from "missed pool” bets being returned to bettors at a later date.
The court does not see where this regulation and implementing memorandum directive are in excess of the Board’s jurisdiction or authority. It may be true that the Board has no authority to create a rule out of harmony with the Racing, Pari-Mutuel Wagering and Breeding Law. However, nothing in either the regulation or memorandum directive does that insofar as the gains or profits are concerned.
The OTBs also make the point that since the regulation and memorandum directive contravene the provisions of the Racing, Pari-Mutuel Wagering and Breeding Law as hereinbefore discussed, the payments directed by the regulation and memorandum directive constitute an improper and unauthorized penalty. However, the court finds that there is no contravention of any of the provisions of the Racing, Pari-Mutuel Wagering and Breeding Law insofar as the gains or profits are concerned. Any argument that insofar as the profits and gains are concerned an improper or illegal penalty is involved is rejected.
Insofar as the return of the profits and gains are concerned the regulation and implementing memorandum directive do not violate the Racing, Pari-Mutuel Wagering and Breeding Law and are therefore valid.
THE REGULATION AND IMPLEMENTING MEMORANDUM DIRECTIVE ARE IMPERMISSIBLY VAGUE AND IMPOSSIBLE OF PERFORMANCE
The OTBs argue that the regulation and memorandum directive are vague and are not susceptible of the precise meaning. The OTBs claim the memorandum directive provides no guidance to effect the return of the accumulated "missed pool” gains or profits. For example, on the target date set by the memorandum directive, no race number or wager type was provided by the Board to receive any part of the accumulated "missed pool” gains or profits. Thus, OTBs argue that because of vagueness and lack of precision it is impossible for the OTBs to perform. As a result, the OTBs claim the regulation and implementing memorandum directive are unconstitu *539 tionally vague and therefore invalid. The OTBs cite Matter of Levine v Whalen (39 NY2d 510) and Matter of Slocum v Berman (81 AD2d 1014). The court agrees with the OTBs.
The memorandum directive of October 8, 1991 stated that the actual races and the pools affected and the applicable amounts to be inserted as a "sweetener” would be announced shortly so that the maximum public exposure can be made.
It does not appear that the Board was requesting that the various OTBs actually turn over to the Board or the track operators the sum of $1,416,646. Rather, the court assumes (and NYRA’s memorandum of law so indicates) that there is going to be a series of debits and credits involved and if the track, for example, is short of money in a race to pay out what it has to pay out, including the "sweetener” in a particular race, then the differences will be made up by the OTBs doing a wire transfer through the banking system on the day following the special racing day. An example might help. The inclusion of such "missed pool” gains or profits in pools on the special racing day or days, as directed by the Board, would have the effect of increasing beyond the levels otherwise obtaining, the payoff prices to winning bettors in the pools so supplemented. Thus the gains or profits that the OTBs retained at the expense of winning bettors in prior State-wide pools by "missing” those pools and booking some customers’ wagers would be returned to winners on the special racing day.
Assume a "win” pool of $100,000 in which 5,000 bets of $2 each are made on the successful horse. In the normal day-today operation of such a pool, the ticket-seller (NYRA or OTB, as the case may be) would deduct its statutorily fixed commission of 17%, leaving $83,000 to be distributed to the winning bettors ($16.60 per $2 wager). (In the case of OTBs, the payoff per $2 wager would be less because of the surcharge.) If the "net pool” of $83,000 after commissions were supplemented $9,000 from earlier "missed pools”, the winning bettors would divide $92,000 ratably producing a payoff price of $18.40 per $2 wager for those betting at the track or at a simulcast outlet. The payoff price at the OTB would be less because of the approximate 7% surcharge.
The court searched the multitudinous papers and fails to find any analysis of breakdown of "missed pool” funds as to type of bet. It also fails to see in the record any detailed plan for the infusion of the total amount of "missed pool” gains *540 and profits back into specific races and specific bets. At most, one can glean from the documents submitted by the Board that it intended to have a total of $853,230 added to races in a single day at a NYRA track. However, there is nothing to show how much will be infused into the first race or the second race or the third race. There is also nothing to show how much of that money will be going into the win, place, show and exacta pools in the first race. It seems to the court that there should be first an analysis of from whence the gains and profits came from. Namely, there should be an analysis on a bet-by-bet basis of where that $853,230 came from. Then, for a rational approach, it would seem that the monies would have to be infused on a proportionate basis back into similar types of bets over the nine races on the card. Until this is done, it would seem that the regulation and implementing directive are indeed vague and invalid. It may well be that such an analysis has been done and a spreading of the funds over particular types of bets has been made but the record does not reflect that. For this reason, the court will grant preliminary injunctive relief to the OTBs until a proper implementing regulation or implementing memorandum directive is devised which clearly shows that the profits and gains will be going into the proper betting pools for redistribution.
The court has also examined the reports from the various OTBs that showed the gains or losses on "missed pool” bets. Those reports, or at least some of them, are exhibit A attached to the affidavit of Margaret Anderson in support of NYRA’s motion for summary judgment dismissing the third cause of action. Those reports are bound together with exhibits B through G. It may well be that the court does not fully understand the reports, but it does seem to the court that the figures are erroneous. For example, one of the reports is from the New York City OTB and involves the racing date of March 17, 1990. The report involves the win pool of the seventh race. The report indicates that the New York City OTB had a net gain of $581.45 as a result of "missed pool” bets. However, what disturbs the court is that it used the track price of $8.80 to calculate that. The New York City OTB did not pay out $8.80. It only paid out $8, or, at least the court believes it was $8. It may have been $8.10. The court has verified that the $8.80 shown as the win price is the track payout price. Typically, the OTB price is 7% less which would make it about an $8 payoff for OTB bettors. Thus, when you *541 take into consideration the surcharge that is subtracted from the "missed pool” on that day at the New York City OTB and adjust all the figures, the court comes up with a net gain of only $541. Clearly, what is in error on that report is that the liability for "missed pool” bets was $1,306.80. The court believes that the actual payout to the winning bettors at OTB was only $1,188.
Another example is in order. Looking at the report for the New York City OTB for the racing date of February 2, 1990 and involving the eighth race win pool, the court again finds a problem with the numbers. The court has verified that the track payout price as indicated by the report was $6.20 and that the OTB payoff price was $5.80. The lesser payoff price is due to the surcharge. Thus, clearly the liability to the winners at the New York City OTB for those "missed pool” bets was not $4,978.60 but was only $4,657.40.
The court realizes that no argument has been made over the accuracy of the various figures. However, the court does have some concern about the validity of the actual numbers.
THE REGULATION AND MEMORANDUM DIRECTIVE ARE IN VIOLATION OF THE NEW YORK STATE CONSTITUTION
Article VII, § 8 (1) of the NY Constitution provides in part: "[t]he money of the state shall not be given or loaned to or in aid of any * * * private undertaking; nor shall the credit of the state be given or loaned to or in aid of any individual.”
The OTBs allege that the effect of the regulation and memorandum directive is to direct the payment of money which would otherwise be distributed to various county governments to private individuals, a result forbidden under the NY Constitution. The OTBs allege that the regulation and memorandum directive provide that the sum of money constituting so-called "missed pools” be arbitrarily dispersed at the whim of the Board to unknown individuals who happen to place wagers on particular betting propositions at some place and time in the future. The OTBs allege that if this money were not so dispersed, it would be distributed to those counties which elected to join a regional off-track betting corporation, otherwise known as "participating counties”.
However, there is nothing in the record to indicate that all of this money would have been tunneled down to the counties in question. The court is unable to make any such *542 determination from the records before it. It could well be that some, all, or none of the $1,416,646 would have reached the counties. There is just nothing in the record to even begin to attempt to speculate whether the counties would receive any of those funds. Even assuming that they would, the court finds and concludes that there is no violation of the NY State Constitution provision prohibiting gifts to individuals. The OTBs cite the cases of Bush v Board of Supervisors (159 NY 212) and Matter of Mahon v Board of Educ. (171 NY 263). The court concludes that these cases that are cited by the OTBs actually lend support to the proposition that there is no prohibitive gift in this situation. Those cases make it clear where the monies involved were originally public monies, there could be a prohibitive gift. In the case at hand, the funds we are talking about were never legitimately public funds. The funds originally belonged to the bettors and, indeed, if the system had worked the way it was supposed to work, those funds would have been returned to the winning bettors. The total funds, the gains or profits of $1,416,646, were never originally public funds and never in fact or in law became public funds. Indeed, as already stated, there is no assurance at least in the record, that if the court were to hold that these funds should be given to the counties and not turned back to the bettors in the form of sweetened "pools”, that the funds would actually reach the counties. That would take a detailed analysis of each OTB, their expenses and so forth.
THE OPERATION OF THE REGULATION AND MEMORANDUM DIRECTIVE VIOLATE THE PRINCIPLES OF PARI-MUTUEL BETTING
The OTBs take the position that by arbitrarily directing the addition of money wagered by particular bettors for particular outcomes to pools comprised of money wagered by other bettors for other outcomes, the regulation and memorandum directive violate the principles of pari-mutuel betting. The OTBs state that the payouts to the bettors who benefit from the infusion of money would have no relation to the odds otherwise established by the manner in which those beneficiary-bettors had wagered. The court assumes this to be true. If the court understands the way it is going to work, whatever amount of "sweetened” money is set forth for a particular race and particular bet would be added into the pool, without *543 commissions being taken out, to be added to the bettor funds that go into the pool from which commissions would be taken out. Looking at the example on page 539 of this decision wherein there was a win pool of $100,000 in which 5,000 wagers of $2 were made on the successful horse, one would see that the odds on the Board would reflect 8 to 1 odds, instead of the normal 7 to 1.
The court sees nothing wrong with this. The situation is similar to the Pick 6 that has no winner on a particular day and the amount left over is carried over to the next day to be included without a new commission being taken out, along with the new Pick 6 money for the second day. The bettors on the second day get a benefit of an infusion of money and many of those bettors on the second day will not have bet the previous day.
The court sees nothing wrong with the approach of the Board. This is a rational way to try to solve the problem and though it technically may not be in strict keeping with parimutuel betting, the court sees no invalidity to the general plan as set forth.
DEFENDANT NYRA’S COUNTERCLAIM SHOULD BE DISMISSED BECAUSE IT FAILS TO STATE A CAUSE OF ACTION
 NYRA seeks an order of the court directing the OTBs to "carry out the Board’s directives”. The court will not grant such an order and will dismiss that counterclaim. The court reads such counterclaim as requesting an order directing the OTBs to not only comply with the regulation and present memorandum directive but also any future directives. NYRA makes the point that implementation of the regulation and memorandum directive will increase the State-wide payoff prices in the pools that will be supplemented with "missed pool” funds. Many of the winners in these pools would be bettors at NYRA’s track on the special day in question. On that day, NYRA will likely have to pay out to successful bettors much more than it takes in at the windows.
This can happen, and more often than not does happen, in some degree, on any racing day, when there is an imbalance in a pool among successful wagers at various OTBs and the track. These discrepancies normally are "cleared” among NYRA and OTBs by bank transfers on the next business day. On the special day in question, these imbalances would be far higher than usual since some $853,232 due on NYRA races *544 will be coming from OTBs’ custody of prior customer funds. A significant portion of that amount will be paid out, in the first instance, by NYRA to its own on-track bettors. The OTBs will, of course, disperse a large portion of the $853,232 to their successful bidders in the "sweetened” pools.
NYRA seems to be worried that there should not be a doubt in question that the clearance "mechanism will work” on the special day or, more particularly, on the next business day.
The record does not indicate whether the OTBs have set up specific reserve funds where these funds are actually existing. It is true from the record that some of the OTBs have set up liabilities on their accounting statements for these monies, but that could be a much different thing than a special reserve fund. The court presumes that the various OTBs are aware of their exposure if the special day in question takes place. For example, on the special NYRA day in question, New York City OTB would have a theoretical exposure of $306,907 and the Capital District OTB would have a theoretical exposure of $176,132. The other OTBs would have varying amounts that run from $52,267 to $126,950. All of such sums total the $853,230.
The court does not believe that there is any grounds for an order directing the OTBs to comply with any directives that may not even be formulated yet. Of course for the reasons already set forth, the court will grant preliminary injunctive relief against compliance with the memorandum directive.
THE SECOND AMENDED AND SUPPLEMENTAL COMPLAINT SHOULD NOT BE DISMISSED
NYRA contends that the OTBs’ second amended and supplemental complaint is unauthorized and should be ignored by the court. The OTBs ask that leave be granted to serve that pleading nunc pro tune pursuant to CPLR 3025 (b). The court will grant such relief to the OTBs. The pleading adds no new facts to the case. It only seeks to add a new or additional theory of recovery. The court sees no prejudice.
OTBS’ THIRD CAUSE OF ACTION IS PERMITTED UNDER 9 NYCRR 5204.15 (C) (2)
The court has already ruled that the second amended and supplemental complaint alleging the third cause of action is permissible and will be received on a nunc pro tune basis. *545 NYRA takes the position that assuming the pleading is not a nullity, the third cause of action should nevertheless be dismissed. The court believes that the OTBs have stated a valid cause of action against intervenors NYRA and Yonkers. In the second amended and supplemental complaint, it is alleged that those tracks failed on occasion through their fault to include monies into the State-wide pools that were timely transmitted. Under the regulation issued by the Board, the OTBs have a cause of action. The court does grant the alternative relief sought by the intervenors-defendants NYRA and Yonkers of severing that cause of action. The outcome of the main dispute is not in any way dependent on any rights of recovery that the OTBs may have against the track operators such as NYRA and Yonkers and any other track operator that failed to include timely transmitted bets into a State-wide pool so that as a result the OTBs ended up with "missed pools” funds as to which they either made a profit or a loss depending on the number of winning tickets that they sold.
NASSAU OTB’S AND SUFFOLK OTB’S CAUSE OF ACTION SEEKING ALTERNATE PARTIAL RELIEF AGAINST THE REGULATION
As already stated, the regulation in question does not allow any offsetting of losses against gains involving the "missed pool” funds. Two of the OTBs, Nassau and Suffolk, take the position that in the event the entire regulation is not declared invalid, then at least so much of the regulation as prevents the offsetting of losses against gains should be declared invalid. Try as the court might, the court can find no authority for the Board to enact the regulation in the manner it did. It does not seem to the court that there is any authority for the Board to deny an offset of losses against gains. The Board and NYRA claim that that part of the regulation which denies an offset is needed because it has prophylactic value. Be that as it may, the denial of an offset for losses seems to be the imposition of a fine or penalty and the court cannot find any authority in the Racing, Pari-Mutuel Wagering and Breeding Law for the Board to impose such fine or penalty. The statement in the memorandum of law of NYRA, which is dated November 19, 1991, is indeed an understatement. The statement the court is referring to is: "Conceivably, the Board can have gone either way on this issue.” NYRA contends that the Board made a judgment call within its broad range of *546 reasonable discretion, and that that should be the end of the matter. However, there has to be some kind of authority in the Racing, Pari-Mutuel Wagering and Breeding Law for this type of extraction of what the court perceives to be a penalty or fine. The court can find no such authority.
The court has no problem with the authority of the Board to mandate that gains or profits that are made on "missed pool” bets should be returned to the bettors. But the court believes that it should be the net gains or profits only. Therefore, insofar as Nassau OTB and Suffolk OTB are concerned, the court will grant so much of the relief as is sought by them only and will declare so much of the regulation that denies an offset invalid as to Nassau and Suffolk OTBs. This would, of course, mandate a recalculation of the amounts Nassau and Suffolk are liable for.