Hon. Jerry Bilinski Formal Opinion Chairman No. 96-F7 NYS Racing and Wagering Board 120 Broadway-13th Floor New York, N Y 10271
Dear Chairman Bilinski:
Your counsel has asked for an opinion whether recent amendments to the Racing, Pari-Mutuel Wagering and Breeding Law (Racing Law), enacted pursuant to Chapter 281 of the Laws of 1994, are applicable to the calculation of post-surcharge breaks on pari-mutuel wagers[1]
NYC Off-Track Betting v. Racing Wagering Bd, 157 Misc.2d 524, 528 (Sup Ct N Y Co 1993). placed at off-track betting corporations (OTBs).
To avoid payouts in pennies, "breaks" or "breakage" was developed as a method of rounding off a bettor's winnings by reducing the payout to an amount set by statute. For example, a pari-mutuel operator will reduce a payout to the nearest nickel or dime, and retain the remaining odd cents. Thus, the smaller the "break," the greater the corresponding payout to the winning bettor.
In 1994, the State Legislature adopted the Omnibus Racing Preservation and Relief Act. See, L 1994 Ch 281. Among other modifications to the Racing Law, Chapter 281 amended the statute's breakage formula. Prior to the 1994 amendments, breaks were determined by the type of bet placed.[2]
Sections one, two and nine of Chapter 281 revised the breakage language in Racing Law sections 228(1) (breakage applicable to non-New York Racing Association [NYRA] thoroughbred racing), 229(1)(a) (breakage applicable to NYRA races), and 318(1) (breakage applicable to harness races), so that breakage is determined by the winning bettor's payout. Thus, as amended by Chapter 281, Racing Law sections 228(1), 229(1)(a) and 318(1) currently read as follows:
 [B]reaks are hereby defined as the odd cents over any multiple of five for payoffs greater than one dollar five cents but less than five dollars, over any multiple of ten for payoffs greater than five dollars but less than twenty-five dollars, over any multiple of twenty-five for payoffs greater than twenty-five dollars but less than two hundred fifty dollars, or over any multiple of fifty for payoffs over two hundred fifty dollars.
Racing Law §§ 228(1), 229(1)(a), 318(1), as amended byL 1994 Ch 281.
The Legislature designed these modifications with the goal of stimulating betting opportunities and increasing interest in pari-mutuel betting by enhancing the payout to bettors who play short-odds horses. See, Governor's Memorandum in Support, Bill Jacket, L 1994 Ch 281. Since short-odds wagers are the type most commonly placed by pari-mutuel bettors, the modifications were designed to have their greatest effect at the harness tracks where the favorite wins more of the time and where short-priced horses are the norm. Id.
Racing Law § 527, governing payouts by OTBs, also requires an application of breakage. In addition, Racing Law § 532 requires application of a second breakage after the imposition of a five percent municipal surcharge on off-track winnings. However, unlike the Racing Law provisions governing on-track breakage, these sections do not contain a definition of breakage, nor do they incorporate the definition of breakage set forth in the on-track statutory provisions. For example, section 532 simply states that "[t]he revenues derived from such surcharge, plus the breaks, shall be held separate and apart from any amounts otherwise authorized to be retained from pari-mutuel pools." (Emphasis added.) Racing Law § 532. The reference to "breaks" in sections 527 and 532 were unchanged by the 1994 amendments.
The changes in the breakage formula prescribed by Chapter 281 went into effect on October 16, 1994. L 1994 Ch 281 § 1. According to information you have provided, the Director of Racing and OTB Operations at the New York State Racing and Wagering Board (Board) issued a memorandum on October 13, 1994 to all mutuel managers and tote vendors stating that "the recent change to the law regarding breakage . . . affects on-track pre-surcharge calculations only. The OTB surcharge will continue to break as it presently does." In essence, the memorandum declared that both on-track and off-track facilities would apply the new breakage formula to their initial payout calculations, but that after the OTBs applied the additional five percent tax surcharge, they would then apply the old breakage formula when rounding the winning down a second time. Thus, it would appear that the Board had chosen to exercise its discretionary authority by effectively directing all off-track surcharges to continue to break as they had prior to the 1994 amendments, that is, by the type of bet placed rather than by the amount of winnings.
This disparity soon generated what you describe as a considerable negative reaction by patrons, who characterized the policy as a bettor-punitive increase in the off-track surcharge. On January 1, 1996, the Board decided to change past administrative practice by requiring that OTBs apply the 1994 change in the breakage formula to post-surcharge payouts. This decision was intended to be implemented on May 1, 1996.
We believe the Legislature intended that the Board fill in the interstices in enabling legislation governing off-track pari-mutuel wagering activities in New York. See, Racing Law §§ 101, 520, 521, 523. By electing not to define post-surcharge breakage for off-track betting in an otherwise detailed statutory framework, it would appear that the Legislature intended to leave this determination to the Board.
Established as an Executive Department entity in 1973, the New York State Racing and Wagering Board was designed to consolidate the operations of the State Racing Commission, Harness Racing Commission, Quarter Horse Racing Commission and the Off-Track Pari-Mutuel Betting Commission. See, L 1973 Ch 346. The Legislature gave the Board general jurisdiction and supervision over, among other things, all pari-mutuel betting activities in the State and the corporations, associations and persons engaged therein. See, Racing Law §§ 101, 503.
Article V-a of the Racing Law establishes several regional OTBs,[3] and authorizes these corporations to conduct within their respective regions a system of off-track pari-mutuel betting on horse races. See, Racing Law § 503(10). These corporations are also authorized to promulgate, amend and repeal any rules and regulations necessary to carry out the purposes of the statute. Racing Law § 503(11)(a). However, the State Racing and Wagering Board retains general jurisdiction over the operation of all OTBs within the State (see, Racing Law §§ 503(10), 520, 521) and the Board is authorized to issue any rules and regulations necessary to insure the accomplishment of the purposes set out in the Racing Law. Racing Law § 520.
Since its inception, the Board has exercised broad regulatory authority over New York's pari-mutuel betting industry.[4] See, L 1973 Ch 346;Finger Lakes Racing Assoc, Inc v. New York State Racing and WageringBoard, 45 N.Y.2d 471 (1978) (the Board has authority to promulgate rules and regulations concerning the distribution of retained commissions to race tracks throughout the state); Capital District Regional Off-TrackBetting Corporation v New York State Racing and Wagering Board,54 N.Y.2d 154 (1981) (the Board has broad powers to regulate OTBs including power to issue rules and regulations, and to resolve disputes between racetracks and OTBs); see also, Bokman v. New York State Racingand Wagering Board, 77 A.D.2d 459 (4th Dept 1980) (construction by the Board of horse racing statutes and regulations established thereunder must be accepted if not irrational or unreasonable, and State Board's determination must be upheld if it is reasonably based in the law).
However, in order to have legal effect, the New York Constitution provides that a rule or regulation of a State board must be formally promulgated in accordance with procedures established by the Legislature. N Y Const Art IV, § 8 ("The Legislature shall provide for the speedy publication of such rules and regulations by appropriate laws."); seealso, People v. Cull, 26 Misc.2d 668, affd10 N.Y.2d 123 (1961) (a directive of a State agency held to be a rule or regulation falling within the coverage of Article IV, § 8 must conform with the State's procedural laws and be properly filed with the Secretary of State). The State Administrative Procedure Act (SAPA) provides for uniform procedures for the promulgation of rules and regulations of administrative bodies, requires publication of proposed rules in the State Register and a period of public comment and hearings before the rules may be imposed. State Administrative Procedure Act § 202. SAPA defines a "rule" as meaning
 (i) the whole or part of each agency . . . regulation or code of general applicability that implements or applies law, or prescribes a fee charged by or paid to any agency or the procedure or practice requirements of any agency . . . and (ii) the amendment, suspension, repeal, approval, or prescription for the future of rates, wages, security authorizations, corporate or financial structures or reorganization thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs or accounting, or practices bearing on any of the foregoing whether of general or particular applicability.
State Administrative Procedure Act § 102(2)(a)(i). In conjunction with criteria it had previously articulated in Matter of Cordero vCorbisiero, 80 N.Y.2d 771 (1992) and Matter of Roman Catholic Diocese v.New York State Dept of Health, 66 N.Y.2d 948 (1985), the Court of Appeals has in Schwartfigure v. Hartnett, 83 N.Y.2d 296 (1992), adopted a definitional test for determining what may constitute a "rule" under SAPA § 102: Where a guideline is a "fixed, general principle" or "rigid numerical formula" to be applied without regard to case-by-case variable factors, it is a "rule" subject to the requirements of SAPA.Schwartfigure, 83 N.Y.2d at 301; see also, Roman Catholic Diocese,66 N.Y.2d at 950. These seminal principles were most recently restated inMatter of NYC Transit Auth. v. NYS Dept. of Labor, ___ N.Y.2d ___ (decided March 28, 1996) (Labor Department penalty guidelines vesting inspectors with significant discretion and flexibility cannot be considered "fixed, general principles" that require rulemaking under Article IX § 8 of the Constitution or SAPA).
Applying the above criteria, we believe that the post-surcharge determination of breakage fits this definition of a "rule". Post-surcharge breakage is a rigid numerical policy of general applicability for all handle paid out by OTBs. See, Roman CatholicDiocese, 66 N.Y.2d at 950. It consists of fixed numbers applicable to pre-determined categories of payouts at OTBs, which are employed without variation.
In addition, breakage cannot be characterized as concerning the internal management of the Board or the regional OTBs and, therefore, exempt from rulemaking. See, Matter of Krauskopf v. Perales, 139 A.D.2d 147, 151 (3d Dept 1988). Breakage significantly affects the revenue of OTBs and their member counties, as well as the payout to OTB patrons.
Therefore, we conclude that the Board has the authority to set post-surcharge breakage in accordance with the requirements of the State Administrative Procedure Act.
Sincerely,
DENNIS C. VACCO, Attorney General
[1] "Pari-mutuel wagering" refers to a method of betting on horse races first devised and employed at the racetracks in France about 120 years ago. At the general election of 1939, Article I, § 9 of the State Constitution was amended to make the pari-mutuel method the only lawful form of wagering on horse races in New York State. As stated in a recent judicial opinion: [t]he essential feature of pari-mutuel wagering is that participants do not bet against the track or "house" (as they do, for example, in the case of roulette wheels and other forms of lawful casino gambling in Nevada and Atlantic City, New Jersey). Rather, they wager against each other and determine the "odds" for an event, which are not known or knowable in advance, by their betting among themselves. The amounts that bettors place on the various possible outcomes are gathered into a pool. A fixed commission that is unaffected by the race's outcome is deducted from the pool by the operator to cover its expenses, meet the taxes imposed on the pool by New York State, etc., and the remainder (the "net pool") is returned ratably to the successful bettors in proportion to the size of their winning bets. If many participants pick the prevailing horse (a "favorite"), the "payout" per dollar bet on that horse is low; if few do so (a "long-shot"), the "payout" per dollar wagered on the winning horse is higher. In the pari-mutuel method, it is important to the bettors, but immaterial to the track or other wagering operator, which horse wins.
[2] For example, "regular bets" and "multiple bets" broke on odd cents over any multiple of $0.10, "exotic bets" on any multiple of $0.50 and "super exotic bets" on any multiple of $1.00. See, Racing Law § 228(1); see also, NYS Racing and Wagering Board, 1994 Annual Report A-19.
[3] The various regions are comprised of counties listed in section 519 of the Racing Law. A special corporation is established for New York City with similar powers as a regional OTB. See, Racing Law §§ 603, 604.
[4] Pari-mutuel activities under the Board's jurisdiction include the New York Racing Association and its three tracks at Saratoga, Belmont and Aqueduct, the Finger Lakes Racing Association, eight independent harness tracks, and six regional off-track betting corporations. In 1994, combined handle for on and off-track wagers totaled $2,712,633,136, generating more than $65 million in revenues for the State and more than $57 million for localities. See, Racing and Wagering Board, 1994 Annual Report 1.1.